Jessie Lloyd MISSKELLEY, Jr. *v.* STATE of Arkansas

CR 94-848 915 S.W.2d 702

Supreme Court of Arkansas
Opinion delivered February 19, 1996

*Stidham & Crow*, by: *Daniel T. Stidham* and *Gregory L. Crow*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

BRADLEY D. JESSON, Chief Justice. On June 21, 1993, the appellant, Damien Echols, and Charles Jason Baldwin were charged with the murders of three West Memphis boys. Steven Branch, Christopher Byers, and Michael Moore, all eight years of age, had been missing since the early evening hours of May 5, 1993. Their bodies were found the next day submerged in a creek in a park-like area of West Memphis known as Robin Hood. The boys' bodies were nude, their hands and feet had been tied, and it was evident they had been severely beaten and mutilated.

The West Memphis Police began an extensive investigation. On June 3, 1993, they questioned the appellant regarding any knowledge he might have about the murders. In the course of the interrogation, he made statements in which he implicated himself, Baldwin, and Echols. All three were arrested and charged with capital murder.

The appellant was tried separately from Baldwin and Echols.[1] The jury convicted him of first-degree murder in the death of Michael Moore, for which he received a life sentence, and second-degree murder in the deaths of Steven Branch and Christopher Byers, for which he received a combined sentence of 40 years. It is from these convictions that he appeals. He raises numerous and varied points for reversal. After thorough consideration of each issue, we find no error and affirm the convictions.

### Sufficiency of the Evidence

It is our general rule that, when an appellant challenges the sufficiency of the evidence, we address that issue prior to all others. *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984). The appellant's argument is directed solely to his first-degree murder conviction.

At the close of the state's case, and again at the close of all evidence, the appellant moved for a directed verdict. He claimed that the state failed to prove he had acted with the purpose of causing the deaths of the three boys, or that he had acted as an accomplice to the commission of a homicidal act. The trial court denied the motion.

A directed verdict motion is a challenge to the sufficiency of the evidence. *Durham* v. *State*, 320 Ark. 689, 899 S.W.2d 470 (1995). The test for determining the sufficiency of the evidence is whether there is substantial evidence to support the jury's verdict. Substantial evidence is that which is forceful enough to compel a conclusion one way or another and which goes beyond speculation or conjecture. *Davis* v. *State*, 317 Ark. 592, 879 S.W.2d 439 (1994). We review the evidence in the light most favorable to the appellee and consider only that evidence

---

[1] The appellant's trial was held in Clay County rather than Crittenden County as the result of a change of venue.

which supports the verdict. *Moore* v. *State*, 315 Ark. 131, 864 S.W.2d 863 (1993).

The Moore, Byers, and Branch boys were last seen at approximately 6:00 p.m. on May 5, 1993. At least two of the boys were riding their bicycles. Their parents reported them missing at about 8:00 p.m. Police and area residents conducted a search later that evening, but the boys were not found. The search continued on May 6. The boys' bodies were discovered about 1:15 that afternoon.

On June 3, 1993, the crime having remained unsolved, Detective Sergeant Mike Allen sought the appellant out for questioning. The appellant was not considered a suspect, but it was thought he might have knowledge about Damien Echols, who was a suspect. Detective Allen located the appellant and brought him back to the station, arriving at approximately 10:00 a.m. Later in this opinion, we will address in detail the circumstances surrounding the appellant's interrogation. For now, it is sufficient to say that the appellant was questioned off and on over a period from 10:00 a.m. until 2:30 p.m. At 2:44 p.m. and again at approximately 5:00 p.m., he gave statements to police in which he confessed his involvement in the murders. Both statements were tape-recorded.

The statements were the strongest evidence offered against the appellant at trial. In fact, they were virtually the only evidence, all other testimony and exhibits serving primarily as corroboration.

The statements were obtained in a question-and-answer format rather than in a narrative form. However, we will set out the substance of the statements in such a way as to reveal with clarity the appellant's description of the crime:

> In the early morning hours of May 5, 1993, the appellant received a phone call from Jason Baldwin. Baldwin asked the appellant to accompany him and Damien Echols to the Robin Hood area. The appellant agreed to go. They went to the area, which has a creek, and were in the creek when the victims rode up on their bicycles. Baldwin and Echols called to the boys, who came to the creek. The boys were severely beaten by Baldwin and Echols. At

least two of the boys were raped and forced to perform oral sex on Baldwin and Echols. According to appellant, he was merely an observer.

While these events were taking place, Michael Moore tried to escape and began running. The appellant chased him down and returned him to Baldwin and Echols. The appellant also stated that Baldwin had used a knife to cut the boys in the facial area and that the Byers boy was cut on his penis. Echols used a large stick to hit one of the boys. All three boys had their clothes taken off and were tied up.

According to the appellant, he ran away from the scene at some point after the boys were tied up. He did observe that the Byers boy was dead when he left. Sometime after the appellant arrived home, Baldwin called saying, "we done it" and "what are we going to do if somebody saw us." Echols could be heard in the background.

The appellant was asked about his involvement in a cult. He said he had been involved for about three months. The participants would typically meet in the woods. They engaged in orgies and, as an initiation rite, killing and eating dogs. He noted that at one cult meeting, he saw a picture that Echols had taken of the three boys. He stated that Echols had been watching the boys.

The appellant was also asked to describe what Baldwin and Echols were wearing the day of the murders. Baldwin was wearing blue jeans, black lace-up boots and a T-shirt with a rendering of a skull and the name of the group Metallica on it. Echols was wearing black pants, boots and a black T-shirt.

The appellant initially stated that the events took place about 9:00 a.m. on May 5. Later in the statement, he changed that time to 12:00 noon. He admitted that his time periods might not be exactly right. He explained the presence of the young boys by saying they had skipped school that day.

The first tape recorded statement concluded at 3:18 p.m. At approximately 5:00 p.m., another statement was

recorded. This time, the appellant said he, Echols and Baldwin had come to the Robin Hood area between 5:00 and 6:00 p.m. Upon prompting by the officer, he changed that to 7:00 or 8:00 p.m. He finally settled on saying that his group arrived at 6:00 p.m. while the victims arrived near dark. He went into further detail about the sexual molestation of the victims. At least one of the boys had been held by the head and ears while being accosted. Both the Byers boy and the Branch boy had been raped. All the boys, he said, were tied up with brown rope.

One of the interrogating officers later testified that his notes revealed the appellant told him he received a phone call from Baldwin on the night before the murders. Baldwin stated that they planned to go out and get some boys and hurt them.

The appellant's statements are a confusing amalgam of times and events. Numerous inconsistencies appear, the most obvious being the various times of day the murders took place. Additionally, the boys were not tied with rope, but with black and white shoe laces. It was also revealed that the victims had not skipped school on May 5. However, there were portions of the statements which *were* consistent with the evidence and were corroborated by the state's testimony and exhibits. The victims had been seen riding their bicycles.[2] The medical examiner testified that the boys had been severely beaten. Two of them had injuries consistent with being hit by a large object. One of the boys had facial lacerations. The Byers boy had indeed been severely mutilated in the genital area. All the boys had injuries which were consistent with rape and forced oral sex. There was evidence that drowning contributed to the deaths of the Moore and Branch boys, but not the Byers boy. This is consistent with the appellant's statement that the Byers boy was already dead when he left the scene. The boys were in fact tied up, albeit with shoe laces rather than rope. Damien Echols was observed near the crime scene at 9:30 p.m. on May 5. He was wearing black pants and a black shirt and his clothes were muddy. A witness testified that she had attended a satanic cult meeting with Echols and the appellant. Steven Byers's mother testified that, approxi-

---

[2] Two bicycles were recovered on May 6 in a bayou near the murder scene.

mately two months before the murders, her son told her that a man dressed all in black had taken his picture. There was evidence that Baldwin owned a shirt and boots of the type described by the appellant. Finally, a witness from the State Crime Lab testified that she found fibers on the victims' clothing which were microscopically similar to items in the Baldwin and Echols residences.

■ The appellant does not argue that the inconsistencies in his statements render them insufficient. Indeed, when inconsistencies appear in the evidence, we defer to the jury's determination of credibility. A jury is free to believe part of the evidence before it and reject other parts. *Harris* v. *State*, 294 Ark. 484, 743 S.W.2d 822 (1988); *Thomas* v. *State*, 266 Ark. 162, 583 S.W.2d 32 (1979). However, the gravamen of this issue is whether the evidence contained in the statements supports a verdict of first-degree murder.

The appellant argues that he did not possess the requisite state of mind for the crime. The jury was instructed that they could find the appellant guilty of first-degree murder if they found he acted with the purpose of causing the death of one of the victims. This is consistent with the language of Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1993).[3] The jury was also instructed on accomplice liability as follows:

> In this case, the state does not contend that Jessie Lloyd Misskelley, Junior acted alone in the commission of the offense of three counts of capital murder. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense. An accomplice is one who directly participates in the commission of an offense or who with the purpose of promoting or facilitating the commission of an offense agrees to aid, aids, or attempts to aid the other person or persons in the planning or committing the offense.

This instruction is consistent with AMCI 401 and Ark.

---

[3] Another part of the statute, Ark. Code Ann. § 5-10-102(a)(3) provides that a person commits first degree murder if he knowingly causes the death of a person 14 years of age or younger. However, the record does not show that the jury was so instructed.

Code Ann. § 5-2-403(a)(2) (Repl. 1993).

 A person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result. Ark. Code Ann. § 5-2-202(1) (Repl. 1993). In cases of murder, a defendant's intent is seldom capable of proof by direct evidence. It must usually be inferred from the circumstances of the killing. *Williams v. State,* 321 Ark. 635, 906 S.W.2d 677 (1995).

 A defendant may be found guilty not only of his own conduct, but also the conduct of his accomplice. When two or more persons assist one another in the commission of a crime, all are accomplices and criminally liable for each other's conduct. *Purifoy v. State,* 307 Ark. 482, 822 S.W.2d 374 (1991). The following factors are relevant in determining the connection of an accomplice with the crime: presence of the accused in the proximity of a crime, opportunity, and association with a person involved in the crime in a manner suggestive of joint participation. *Id.* Mere presence, acquiescence, silence or knowledge that a crime is being committed, in the absence of a legal duty to act, is not sufficient to make a person an accomplice. *Fight v. State,* 314 Ark. 438, 863 S.W.2d 800 (1993) (supplying intoxicant to one who later commits manslaughter does not support accomplice liability for manslaughter). However, where the state establishes evidence that the accused purposefully aided in the commission of the crime, a conviction for first-degree murder based on accomplice liability will be upheld. *Riggins v. State,* 317 Ark. 636, 882 S.W.2d 664 (1994).

The jury's decision to convict the appellant of a greater offense in the death of Michael Moore indicates that much importance was placed on the appellant's chasing down the boy and returning him to the scene where brutal beatings and sexual assaults were taking place. Such an act is highly suggestive of joint participation in the crime. There was also evidence that the appellant knew the night before the murders that Baldwin and Echols were going to "get some boys" and hurt them. His participation in bizarre cult activities with Baldwin and Echols, while not conclusive of intent standing alone, reinforces the probability of his participation in such brutal murders. Finally, the appellant's detailed knowledge of the injuries inflicted on the boys

suggests that he was in physical proximity to the activities taking place and took a much more active role than he admitted. The jury was not required to give credence to the appellant's contention that, for the most part, he was merely an observer. *Riggins v. State, supra.*

■ We conclude that there is substantial evidence the appellant purposely aided and facilitated his accomplices in the commission of first-degree murder and therefore find sufficient evidence to support his conviction.

### Voluntariness of Confession

Prior to trial, the appellant moved to suppress his confessions on the grounds that they were not voluntarily given, that his waiver of *Miranda* rights was not made voluntarily, knowingly and intelligently, and that his waiver of rights was invalid because it was obtained without his parent's signature (the appellant was seventeen at the time he was interrogated).

The testimony at the suppression hearing revealed the following sequence of events leading up to the appellant's confessions. Approximately one month into the investigation, the police considered Damien Echols a suspect in the murders, but no arrests had been made. The appellant's name had been given to officers as one who participated in cult activities with Echols. Detective Sergeant Mike Allen questioned the appellant on the morning of June 3, 1993. The appellant was not considered a suspect at that time.

Detective Allen attempted to locate the appellant at home, but was unsuccessful. He found the appellant's father at his work place and told him he wanted to talk to the appellant. Mr. Misskelley, Sr., said he would find the appellant and bring him to the work place. When the appellant arrived, Detective Allen asked him if he could come with him to the police department to talk about the case. The appellant readily accompanied Allen. He was not handcuffed and rode in the front seat of the car.

The two arrived at the station at approximately 10:00 a.m. Detective Allen and Detective Bryn Ridge questioned the appellant for about an hour when they became concerned that he wasn't telling the truth. In particular, he denied participation in the cult activity, a statement which was at odds with what other

witnesses had said. At this point, the detectives decided to advise the appellant of his rights. Detective Allen read him a form entitled "YOUR RIGHTS," and verbally advised him of the *Miranda* rights contained in the form. The appellant responded verbally that he understood his rights and also initialled each component of the rights form. There was no evidence of any promises, threats or coercion.

The form also contained a section entitled "WAIVER OF RIGHTS," which read as follows:

> I have read this statement of my RIGHTS and I understand what my RIGHTS are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing, no promises or threats have been made to me and no pressure or force has been used against me.

The waiver was signed by the appellant.

After he was advised of his rights and had waived them, the appellant was asked if he would take a polygraph examination. He agreed that he would. Detective Allen took the appellant to look for his father so that his father could grant permission for the appellant to take the polygraph.[4] They observed Mr. Misskelley driving on the same road they were on, stopped him, and received the authorization. There was no evidence of promises, threats or coercion.

Upon returning to the station, Detective Bill Durham, who would administer the polygraph, once again explained the appellant's rights to him. The appellant verbally indicated he understood, and initialled and signed a second rights-and-waiver form that was identical to the first.

Detective Durham explained to the appellant how the polygraph would work and administered the test over the course of one hour. In Detective Durham's opinion, the appellant was being deceptive in his answers and he was advised that he had

---

[4] Ark. Code Ann. § 12-12-703 (Repl. 1995) provides that no psychological stress evaluation shall be given to any person under age 18 without first having received written authorization from a parent or guardian.

failed the test. At that point, the appellant became nonresponsive.

Detective Bryn Ridge and Inspector Gary Gitchell began another interrogation of the appellant at about 12:40 p.m. They employed a number of techniques designed to elicit a response from the appellant. A circle diagram was drawn and the appellant was told that the persons who committed the murders were inside the circle and that those trying to solve the crime were on the outside. He was asked whether he was going to be inside the circle or outside. He apparently had no response. He was then shown a picture of one of the victims and had a strong reaction to it. According to Gitchell, the appellant sank back into his chair, grasped the picture and would not take his eyes off it. Yet, he still did not speak. Finally, Gitchell played a portion of a tape-recorded statement which had been given by a young boy named Aaron. The boy was the son of a friend of the appellant's and had known the victims. The portion of the statement which the officers played was the boy's voice saying, "nobody knows what happened but me." Upon hearing this, the appellant stated that he wanted out and wanted to tell everything.

The officers decided to tape-record a statement and received the confessions which are set out above. At the beginning of the first statement, on tape, the appellant was advised of his rights for the third time. The rights were fully explained to him, and the waiver of rights read to him verbatim.

The evidence presented by the appellant at the suppression hearing consisted primarily of the testimony of polygraph expert Warren Holmes. Mr. Holmes testified that, in his opinion, the appellant had not been deceptive in his answers to the polygraph questions. He raised the possibility that the appellant had been wrongly informed that he had failed.

Seven days after the suppression hearing, the trial court entered an order denying the motion to suppress. The appellant argues that the court's ruling was erroneous.

When the voluntariness of a confession is in issue, we make an independent determination of voluntariness based upon the totality of the circumstances surrounding the confession. We do not reverse a trial court's finding of voluntariness

unless it is clearly against the preponderance of the evidence. *Douglas* v. *State*, 286 Ark. 296, 692 S.W.2d 217 (1985). Among the factors to be considered in determining the validity of a confession are the age, education and intelligence of the accused, the advice or lack of advice on constitutional rights, the length of detention, the repeated or prolonged nature of questioning, or the use of mental or physical punishment. *Id.* A custodial confession is presumed involuntary and the burden is on the state to show that the confession was voluntarily made. *Noble* v. *State*, 319 Ark. 407, 892 S.W.2d 477 (1995).

The appellant offers several reasons why we should invalidate his confession. First, he argues that the confession was the product of a promise of reward or leniency. He points to the use of the circle diagram, which he describes as an implied offer of leniency, and to the existence of a $30,000.00 reward which was in effect at the time the appellant was questioned. A confession obtained through a false promise of reward or leniency is invalid. *Hamm* v. *State*, 296 Ark. 385, 757 S.W.2d 932 (1988). However, there is no evidence that the appellant's confession was obtained in such a manner. The circle diagram, while used to encourage the appellant to respond to questions, cannot be considered as a false promise of leniency. There was no implication that if the appellant talked the officers would recommend leniency or try to help him in any way. Likewise, the existence of a monetary reward does not invalidate the confession. Although their testimony was disputed, the officers testified at the suppression hearing that they did not communicate the reward offer to the appellant at any time. The trial judge was entitled to believe this evidence. *Everett* v. *State*, 316 Ark. 213, 871 S.W.2d 568 (1994).

Next, the appellant argues that his age and mental capacity rendered his confession involuntary. While age and mental capacity are factors we consider, those factors standing alone are not sufficient to suppress a confession. *Mitchell* v. *State*, 295 Ark. 341, 750 S.W.2d 936 (1988); *Douglas* v. *State*, *supra.*

At the time the appellant was interrogated he was seventeen years old, and just thirty-seven days away from his eighteenth birthday. Persons younger than he have been held

capable of giving voluntary confessions. *Oliver* v. *State,* 322 Ark. 8, 907 S.W.2d 706 (1995) (fifteen-year old); *Douglas* v. *State, supra* (fifteen-year-old); *Smith* v. *State,* 286 Ark. 247, 691 S.W.2d 154 (1985) (sixteen-year-old); *Hunes* v. *State,* 274 Ark. 268, 623 S.W.2d 835 (1981), *cert. denied,* ___ U.S. ___, 115 S.Ct. 134 (1994) (sixteen-year-old). The appellant also points to evidence that his IQ was 72 and that he read at a third-grade level. A low score on an intelligence quotient test does not mean that a suspect is incapable of voluntarily making a confession or waiving his rights. *Oliver* v. *State, supra; Hart* v. *State,* 312 Ark. 600, 852 S.W.2d 312 (1993); *Hill* v. *State,* 303 Ark. 462, 798 S.W.2d 65 (1990). *Oliver* is particularly on point. There, we held that a fifteen-year old with an IQ of 74 and a second-grade reading level was capable of comprehending his *Miranda* rights and of waiving those rights. The appellant's situation is similar. In fact, he was two years older than Oliver and had a slightly higher reading level.

As we have pointed out, the appellant was nearly eighteen-years old when his confession was made. He was advised of his rights, both verbally and in writing, on three separate and distinct occasions over the course of four hours. There was evidence that, between 1988 and 1992, he had been advised of his rights in juvenile proceedings on three occasions. He was no stranger to the criminal justice system, a factor which we have considered in the past. *Lowe* v. *State,* 309 Ark. 463, 830 S.W.2d 864 (1992). Between the first time the appellant was advised of his rights and the time he gave his first statement, a period of just over four hours elapsed, which is not undue. The officers' questioning was persistent, but that is permissible. *Noble* v. *State,* 319 Ark. 407, 892 S.W.2d 477 (1995). There was no evidence of mental or physical punishment.

The appellant argues that his statements should be suppressed because of the techniques used by the police in questioning him. He is referring in particular to the use of the circle diagram, the polygraph, the picture of the victim, and the tape recording of the boy's voice. We have said that police may use some psychological tactics in eliciting a custodial statement so long as the accused's free will is not completely overborne. *Noble* v. *State, supra.* In *Noble,* we held that showing the accused a picture of the victim and telling him he would not pass a poly-

graph didn't invalidate a confession. The circle diagram is a rather innocuous means of getting an accused to talk. It does not have any features which strike us as overbearing. The tape of the boy's voice gives us pause. This is the type of tactic that comes perilously close to psychological overbearing, and we cannot condone its use. However, in this instance, since numerous other factors point to the voluntariness of the confession, we will not invalidate the confession.

After an independent review of the foregoing factors, we conclude that the trial judge's determination of voluntariness was correct. We are likewise convinced, based upon the same facts, that the appellant's waiver of his rights was voluntary, knowing and intelligent. When we analyze the validity of a rights waiver, we look to many of the same factors used in determining the voluntariness of a confession. *See Bryant* v. *State*, 314 Ark. 130, 862 S.W.2d 215 (1993); *Hart* v. *State, supra.*

The appellant's next attack on the validity of his confession concerns the failure to have a parent sign his waiver of rights form. At the time the appellant signed his waiver, Ark. Code Ann. § 9-27-317(f) (Repl. 1993) provided that a juvenile's waiver form must be signed by a parent, guardian or custodian.[5] We addressed this issue most recently in *Ring* v. *State*, 320 Ark. 128, 894 S.W.2d 944 (1995). We held that, when a person under age eighteen is charged as an adult in circuit court, failure to obtain a parent's signature on a waiver form does not render a confession inadmissible. The issue was first addressed in *Boyd* v. *State*, 313 Ark. 171, 853 S.W.2d 263 (1993). That opinion was delivered on May 17, 1993, seventeen days before the appellant was interrogated. We held unequivocally that, when a juvenile is charged as an adult, he becomes subject to the procedures applicable to adults. Therefore, the requirement of parental consent is limited to juvenile court proceedings. The appellant urges us to overrule *Boyd* and its progeny, but it would be the height of unfairness for us to tell the prosecutors and law enforcement officials of this state that a parental signature was not necessary, then declare nearly three years later that lack of such a signature

---

[5] This requirement was eliminated by the legislature by Act 67 of the Second Extraordinary Session of 1994.

was fatal to an accused's confession. This is especially true in light of the fact that we reaffirmed *Boyd* in *Ring* and in the interim case of *Rhoades* v. *State*, 315 Ark. 658, 869 S.W.2d 698 (1994). We therefore decline the invitation to overrule this line of cases.

The appellant further argues that the distinction between the rights accorded to those who are tried in juvenile court and those who are tried as adults violates the Equal Protection Clause. On appellate review, we presume that a statute is constitutional, and the attacking party has the burden of proving otherwise. All doubts are resolved in favor of constitutionality. *Reed* v. *Glover*, 319 Ark. 16, 889 S.W.2d 729 (1994). Classifications are permitted which have a rational basis and are reasonably related to a legitimate government purpose. Our role is not to discover the actual basis for the legislation, but to consider whether any rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation is not the product of utterly arbitrary and capricious government purpose. *Streight* v. *Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983).

We can certainly conceive of a rationale which removes this statute from the specter of arbitrary and capricious government purpose. The legislature recognized in Ark. Code Ann. § 9-27-318(c) (Repl. 1993) that a juvenile over the age of sixteen may be prosecuted as an adult where his act would constitute a felony if committed by an adult. This is an acknowledgement that an older juvenile who commits a serious crime may not receive the protection of juvenile proceedings, but will face the consequences as an adult. The same rationale applies to the statute at hand. A juvenile over the age of sixteen who commits a crime that would subject him to adult punishment will not be accorded the protection of full parental involvement in the interrogation process.

The appellant next contends that his confession should have been suppressed due to the failure of Detective Allen to comply with Ark. R. Crim. P. Rule 2.3. That rule requires an officer who asks a person to come to a police station to take reasonable steps to make it clear that there is no legal obligation to comply with the request.

This issue arose in a unique procedural way at the trial level. The appellant never raised the point in his motions to suppress or at any time during the suppression hearing. During the suppression hearing, Detective Allen testified that he asked the appellant if he would come with him to the station and the defendant voluntarily did so. However, the state, at this point, was unaware of any Rule 2.3 problem, and no further testimony was elicited. After the suppression hearing, the appellant, in a post-hearing brief, raised the issue for the first time.

■■ We recognize that the state has the burden of proving the voluntariness of a custodial confession. However, we are hesitant to hold that a defendant may file a general motion to suppress, containing no notice of any technical deficiency, then require the state to put on evidence of compliance with all conceivable technical requirements of the Rules of Criminal Procedure. This is totally contrary to our rule that objections must be raised in a timely manner. *Edwards* v. *State*, 321 Ark. 610, 906 S.W.2d 310 (1995). However, just as importantly, the appellant did not obtain a ruling from the trial court on this specific issue. The court's order denying the motion to suppress was drafted by appellant's counsel. It declared that appellant's statements were voluntarily given, that the appellant was afforded his rights under the Constitution, that his rights were knowingly and willfully waived. There is no mention in the order, or during the course of any hearing, of a violation of Rule 2.3. An issue is precluded from review on appeal where there is no clear ruling by the trial court. *Bowen* v. *State*, 322 Ark. 483, 911 S.W.2d 555 (1995). In *Bowen*, the appellant moved to suppress his inculpatory statements on the grounds that his waiver of rights was invalid, his waiver was not voluntary, knowing and intelligent, and his statements were the fruit of an illegal arrest. The trial court ruled generally on the waiver questions, but did not specifically rule on the illegal arrest issue. We therefore declined to consider the issue on appeal. Similarly in this case, the appellant obtained rulings on the voluntariness of his confession and his waiver, but no ruling on his illegal seizure. As in *Bowen*, we will not consider the issue.

■ The appellant's final attack on the validity of his confession concerns the failure of the police to record the interrogation in its totality. No Arkansas law requires this. We will con-

sider such a factor in the totality-of-the-circumstances mix, but we will not invalidate a confession for that reason alone.

## Pre-Trial Matters

Before we move on to consideration of trial errors, there are two issues which arose before trial and which we will now discuss. The first is the appellant's challenge to the constitutionality of Ark. Code Ann. § 16-89-111(d) (1987). The statute reads:

> A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that the offense was committed.

The appellant contrasts this statute with Ark. Code Ann. § 16-89-111(e)(1) (1987) which provides that a conviction may not be had on the testimony of an *accomplice* unless corroborated by other evidence tending to connect the appellant with the commission of the offense. While offering no authority in support, he argues that the more stringent corroboration requirements in the case of accomplice testimony violate the equal protection clause. The same analysis we applied to the appellant's previous equal-protection challenge applies here. There is a legitimate rationale for greater safeguards when an appellant's conviction is based on the testimony of a third person rather than on his own words.

The next issue concerns the appellant's attempt to depose the interrogating officers. The court offered to make the officers available for questioning, but would not require them to submit to depositions. We do not reverse for failure to grant discovery in a criminal case without a showing of abuse of discretion. *Sanders v. State*, 276 Ark. 342, 635 S.W.2d 222 (1982); Ark. R. Crim. P. Rule 17.4. In *Spencer v. State*, 285 Ark. 339, 686 S.W.2d 436 (1985) and *Hoggard v. State*, 277 Ark. 117, 640 S.W.2d 102 (1982), *cert. denied*, 460 U.S. 1022 (1983), we held that a defendant was not necessarily entitled to take the discovery depositions of state witnesses. We have never held that a defendant should be allowed to depose interrogating officers. The public-policy considerations alone dictate that depositions of police officers should not be taken as a matter of routine, but only in rare cases, subject to the trial court's discretion. A defendant's discovery needs are ordinarily met by the broad

access given to him by the Rules of Criminal Procedure. We find nothing in the record of this case to indicate that the trial court abused its discretion in denying the depositions.

### Evidentiary Errors

The next issues concern various evidentiary rulings of the trial court. We note at the outset that a trial court is accorded wide discretion in evidentiary rulings and will not be reversed on such rulings absent a manifest abuse of discretion. *Harris* v. *State*, 295 Ark. 456, 748 S.W.2d 666 (1988).

As we alluded to earlier, the appellant procured the services of polygraph expert Warren Holmes. Holmes was prepared to offer an opinion that the appellant was not being deceptive when the polygraph test was administered to him. The appellant asked the court to allow this opinion into evidence to show that he was falsely informed he had failed the test and that such false information was a catalyst to his confession. The court considered the evidence at the suppression hearing, but refused to allow any testimony at trial regarding the results of the polygraph. The court noted that such evidence would simply amount to a contest between two experts as to who had made the more accurate interpretation. The court said it would allow the appellant to show that he had been administered a polygraph and had been told he failed it. However, the appellant understandably declined this offer, fearing it might be too prejudicial in the absence of the countervailing opinion of Holmes.

Both the legislature and this court have recognized the inherent unreliability of polygraph tests. Ark. Code Ann. § 12-12-704 (Repl. 1995), provides that the results of a psychological stress examination shall not be admissible in the courts of this state. *See also Cogburn* v. *State*, 292 Ark. 564, 732 S.W.2d 807 (1987); *Baxter* v. *Dental Examiners Bd.*, 269 Ark. 67, 598 S.W.2d 412 (1980). However, the appellant argues that his proffered evidence was necessary to apprise the jury of the totality of the circumstances surrounding his confession. We believe our long-standing rule prohibiting the admission of polygraph results should prevail. Had the trial judge allowed Mr. Holmes to offer his opinion that the appellant's answers were not deceptive, the state would have offered the opinion of Detective Durham that the appellant's answers *were* deceptive. This would have created

the very situation which the legislature and the courts have sought to avoid: the likelihood of credibility determinations being made by reference to the unreliable results of a polygraph examination. *See generally Wingfield* v. *State*, 303 Ark. 291, 796 S.W.2d 574 (1990).

The appellant cites us to *Rock* v. *Arkansas*, 483 U.S. 44 (1987) for the proposition that evidence which might ordinarily be considered unreliable is admissible to protect a defendant's constitutional rights. *Rock* involved a defendant who testified in her own behalf and wanted to offer hypnotically refreshed testimony. The Supreme Court allowed the evidence, but the Court's ruling is not applicable to this case. *Rock* only applies to the testimony of the defendant, not to witness testimony. Further, the basis of the ruling was the protection of the defendant's right to testify in her own defense, which is not the issue here.

The appellant also cites *Patrick* v. *State*, 295 Ark. 473, 750 S.W.2d 391 (1988) for the proposition that evidence which may not be admissible to prove a person guilty *is* admissible as exculpatory evidence. *Patrick* involved the use of a portable breath test. We held that such a test could not be used to prove a person drove while intoxicated but could be used to prove that he did not. However, we were careful to make the point that such a test was sufficiently reliable to warrant admission into evidence. As we have already stated, that is not the case with polygraph results. We therefore uphold the trial court's exclusion of this evidence.

The next point concerns the testimony of Dr. Richard Ofshe, an expert in the coercive influence of police interrogation techniques. Dr. Ofshe was allowed to offer an opinion that the tactics used by the West Memphis Police were suggestive and led the appellant to make his statements. As part of the basis for his opinion, Dr. Ofshe relied on the transcript of a three-hour interview he had conducted with the appellant. The court refused to allow the witness to refer to the interview. The appellant argues that this was error and cites A.R.E. Rule 703 for the proposition that an expert must be able to reveal the factual bases for his opinions. The appellant has not shown that he was prejudiced by the court's ruling. The expert was allowed to identify all other matters on which he based his opinion, such as the tran-

scripts of the appellant's statements, the appellant's treatment records, the officers' notes, and the officers' testimony. Additionally, during cross-examination, Dr. Ofshe was asked if, before hearing the officers testify, he had formed a preliminary opinion regarding the coercive nature of the interrogation. He answered that his opinion at that point was "based on the materials available to me which included my having interviewed Jessie Misskelley." The jury was thus informed that Dr. Ofshe had interviewed the appellant and had used that interview as a basis for his opinion. Therefore, we find no prejudicial violation of Rule 703.

The appellant also presented the testimony of a psychologist, Dr. William Wilkins, for the purpose of showing that his confession was the product of coercion. Dr. Wilkins offered his opinion that the appellant was "quite suggestible." The doctor had administered a suggestibility test to the appellant based upon the Gudjonsson suggestibility scale. The court held a hearing on the admissibility of the test results. Dr. Wilkins admitted he had never administered the test before. The state called another psychologist, Dr. Vaughn Rickert, to testify that he had never heard of the test and, based on what he had just been informed, he had serious concerns about its validity. The court refused to allow evidence of the test results, citing its unreliability and Dr. Wilkins' lack of experience in administering it.

Again, the appellant cannot show he was prejudiced by the court's ruling. Dr. Wilkins was allowed to offer his opinion. Further, he informed the court that his opinion would not be altered by the absence of the test results. We will not reverse in the absence of prejudice. *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied*, 470 U.S. 1085 (1985).

The final evidentiary issues can be discussed together. The appellant argues that the following evidence was erroneously admitted because it was either irrelevant, or its probative value was outweighed by its unfairly prejudicial effect: 1) a picture of Jason Baldwin wearing a black T-shirt with a skull and the name of the group Metallica on it; 2) testimony of a witness that she attended a cult meeting with the appellant and Echols; 3) a book on witchcraft found in Echols' home; 4) the testimony of Melissa Byers that her son told her that a man wearing black

had taken his picture; 5) fiber evidence linking Baldwin and Echols to the crime; 6) boots worn by Baldwin and Echols; and 7) testimony that Echols was observed near the crime scene on the night of the murder.

Relevant evidence means any evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. A.R.E. Rule 401. A trial court's ruling on relevancy is entitled to great weight and will be reversed only for an abuse of discretion. *Dixon v. State*, 311 Ark. 613, 846 S.W.2d 170 (1993). As the appellant has taken pains to point out, the credibility of his confession was the linchpin of the case. Every item of evidence listed above served to corroborate some aspect of the appellant's confession: the description of Baldwin's shirt, the involvement in the occult, the fact that Echols had photographed the victims and had been watching them, and the fact that Echols and Baldwin were involved in the crime. Evidence which is offered by the state to corroborate other evidence is relevant. *Crow v. State*, 306 Ark. 411, 814 S.W.2d 909 (1991); *Hooks v. State*, 303 Ark. 236, 795 S.W.2d 56 (1990).

The appellant's argument that the evidence was more unfairly prejudicial than probative must also fail. With the confession being the state's only meaningful evidence against the appellant, any corroboration was highly probative. This is especially true in light of the appellant's contention that his confession was false. The prejudicial effect of the evidence was not so high as to outweigh its important probative value. We defer to the sound discretion of the trial judge and uphold his ruling admitting the evidence. *Bennett v. State*, 297 Ark. 115, 759 S.W.2d 799 (1988).

### Jury Instructions

The appellant requested two instructions which were not given by the court. The first instruction concerned accomplice liability, and read as follows:

> An accomplice is criminally responsible for the acts of others only to the extent he has shared criminal purpose with the others. If you ultimately find that Jessie Lloyd Misskelley, Jr. was an accomplice, you may find him

guilty only of a crime you determine that he had a conscious object to engage in, or a conscious object to cause such a result.

The appellant based his proffered instruction on language from *Fight* v. *State, supra.*

■ The court instructed the jury on accomplice liability using AMCI 401. If an AMCI is available on the subject, a non-AMCI instruction should not be used unless the AMCI does not state the law. *Henderson* v. *State,* 284 Ark. 493, 684 S.W.2d 231 (1985). AMCI 401 matches the language contained in Ark. Code Ann. § 5-2-403(a) (Repl. 1993) and is a proper statement of the law. Therefore it was not error to refuse the appellant's proffered instruction. *See Hill* v. *State,* 318 Ark. 408, 887 S.W.2d 275 (1994).

■ The appellant also claims it was error for the court to refuse to instruct the jury on manslaughter. The jury was instructed on capital murder, first-degree murder and second-degree murder. We note at the outset that the appellant cannot obtain reversal of his first-degree murder conviction on this issue. Failure to instruct on a lesser-included offense is harmless error where a jury has been instructed on some lesser-included offense, yet convicted the defendant of a greater one. *Gidron* v. *State,* 316 Ark. 352, 872 S.W.2d 64 (1994).

■ It is proper to refuse an instruction on manslaughter if there is no rational basis to support it. *Allen* v. *State,* 310 Ark. 384, 838 S.W.2d 346 (1992); *Watson* v. *State,* 290 Ark. 484, 720 S.W.2d 310 (1986). The appellant asked for the instruction on the chance that the jury might consider his conduct reckless, as opposed to purposeful or knowing. *See* Ark. Code Ann. § 5-10-104(a)(3) (Repl. 1993). Reckless conduct requires the state of mind of conscious disregard of a perceived risk. Disregard of the risk must constitute a gross deviation from the standard of care that a reasonable person would observe in the situation. *See* Ark. Code Ann. § 5-2-202(3) (Repl. 1993). By his own words, the appellant was fully aware of the magnitude of the crimes to which he was an accomplice. He was fully aware of the severe beating, cutting, and sexual molestation of the victims. His retrieval of the boy who tried to escape is evidence of an overall state of mind which far exceeds "gross deviation from the stan-

dard of care." We hold that there was no rational basis for a manslaughter instruction.

## Motion for New Trial

The appellant moved for a new trial on the ground of newly discovered evidence. The motion was denied by the trial court. It was based on the testimony of the medical examiner, Dr. Frank Peretti.

On two occasions before trial, appellant's counsel asked Dr. Peretti if he had an opinion on time of death. Dr. Peretti stated that he did not. However, after the appellant's trial was concluded, Dr. Peretti testified at the Baldwin/Echols trial that his estimate of time of death was between 1:00 a.m. and 5:00 p.m. on May 6, 1993. The appellant moved for a new trial claiming that this newly discovered evidence cast doubt on the validity of his confession. He also claimed that, at the Baldwin/Echols trial, Dr. Peretti offered testimony that lack of blood at the scene indicated the victims might have been killed elsewhere and that the type of cuts in Steven Byers's genital area would require some skill and precision.

Newly discovered evidence is the least favored ground for a new trial motion. When a new trial is denied on this ground, we will reverse only for an abuse of discretion. *Bennett v. State*, 307 Ark. 400, 821 S.W.2d 13 (1991). To prevail, the appellant must show that the new evidence would have impacted the outcome of his case, and that he used due diligence in trying to discover the evidence. *Newberry v. State*, 262 Ark. 334, 557 S.W.2d 864 (1977).

The appellant used due diligence in seeking an opinion from Dr. Peretti regarding time of death. The same cannot be said of the other evidence. The evidence regarding the use of the knife and the scene of the murders was brought out in the Baldwin/Echols trial on vigorous cross-examination. The appellant has not shown that, prior to his conviction, he could not have discovered such evidence.

The question regarding Dr. Peretti's opinion is whether it would have impacted the outcome of the trial. We think it would not have. The appellant's statements were already filled with mistakes, inconsistencies, and gross inaccuracies regarding the

time that the murders took place. It is obvious that the jury disregarded the appellant's time estimates, as it was their right to do. Dr. Peretti's opinion could only have served to reinforce what the jury already knew: the appellant was either mistaken or not telling the truth regarding the timing of events on May 5.

Based upon the foregoing, we find that the trial court did not abuse its discretion in denying the new trial.

### Compliance with Rule 4-3(h)

The record has been reviewed in accordance with Arkansas Supreme Court Rule 4-3(h), and it has been determined that there were no errors with respect to rulings on objections or motions prejudicial to the appellant not discussed above.

Affirmed.

### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
#### APRIL 1, 1996

915 S.W.2d 702

*Stidham & Crow*, by: *Daniel T. Stidham* and *Gregory L. Crow*, for appellant.

No response.

BRADLEY D. JESSON, Chief Justice. We write to address an issue which we did not discuss in our February 19, 1996, opinion. In that portion of the appellant's brief devoted to the failure of the officers to record his entire interrogation, the appellant mentions briefly, and without citation to any authority, the possibility of an equal protection violation. His argument is based upon the existence of what is known as the Law Enforcement Officers' Bill of Rights, Ark. Code Ann. § 14-52-301 to 307 (Supp. 1995). In particular, he points to Ark. Code Ann. § 14-52-303(7) which provides in pertinent part:

> All interrogations of a law enforcement officer in connection with an investigation against him or her shall be recorded in full.

The appellant's argument is that, under this statute, a police officer benefits from greater protection during an interrogation process than an accused. He claims that there is no rational basis for such a distinction. Without reaching the issue of whether a rational basis exists, we hold that the appellant's argument must fail. The "Bill of Rights" is in fact only a recommendation of the legislature ("the purpose of this subchapter is to recommend a basic Bill of Rights for law enforcement officers. . . ."), giving municipalities the authority to establish "any or all" of the Act's procedures as "a guide for negotiating personnel issues with their law enforcement officers." Ark. Code Ann. § 14-52-301 (Supp. 1995). The appellant has made no showing that there is, in fact, a municipality which has actually adopted the particular provision of which he complains. In other words,

we cannot assume that police officers are currently enjoying the procedural protections contemplated by the Act. Therefore, we cannot say under these circumstances that mere recommendations by the legislature, which leave open the authority of municipalities to establish or not establish all or any part of the law, constitute a classification which violates the equal protection clause.

The other matters raised in appellant's petition for rehearing concern our holding on the Ark. R. Crim. P. Rule 2.3 issue. That issue was fully developed, both in the briefs and during oral argument, and was carefully considered by the court. It will not be addressed again on rehearing.