Walter Anthony WEBB *v.* STATE of Arkansas

CR 96-220                                     938 S.W.2d 806

Supreme Court of Arkansas
Opinion delivered January 21, 1997

*McDaniel & Wells, P.A.*, by: *Phillip Wells*, for appellant.

*Winston Bryant*, Att'y Gen., by: *David R. Raupp*, Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant, Walter Anthony Webb, appeals the judgment of the Greene County Circuit Court finding him guilty of two counts of capital murder for the murders of Aurora Carney and James Graves on October 8, 1994. Appellant was tried by a jury and sentenced to life imprisonment without parole on both counts. Jurisdiction is properly in this court pursuant to Ark. Sup. Ct. R. 1-2(a)(2). Appellant raises three arguments for reversal: (1) That there was insufficient evidence of premeditation and deliberation to convict him of capital murder in both deaths; (2) that the trial court erred in allowing the State to present hearsay evidence of a statement made by Appellant to a clinic nurse; (3) and that the trial court erred in refusing to grant a mistrial when a law enforcement officer testified about what Appellant had told him concerning Carney's participation in witchcraft and voodoo. We do not reach the merits of Appellant's first point due to a procedural bar, and we find no merit to the remaining arguments and affirm the trial court's judgment.

## I. Facts

The evidence presented at trial revealed the following facts. On Sunday morning, October 9, 1994, Ginger Sain went to her father's apartment in Rector, Arkansas, to check on his welfare. When she arrived at the apartment, she unexpectedly discovered her father, James Graves, lying on his back on the floor with blood coming out of his nostrils and an unknown woman, later identified as Aurora Carney, sitting slumped over in a chair. Mrs. Sain contacted her husband and then contacted the paramedics and the

police. The paramedics confirmed that Graves and Carney were dead. The state medical examiner later determined that Carney died as a result of a single gunshot wound to the left side of her head and that Graves died as a result of two gunshot wounds to the head, one on either side.

The same day the bodies were discovered, Investigator Steve Huddleston, of the Arkansas State Police, conducted an interview with Appellant. At trial, Huddleston testified that when he informed Appellant that Carney, who was Appellant's fiancee, was dead, Appellant seemed to be in shock. Huddleston stated that Appellant's response was, "In a car accident?" Upon being informed by Huddleston that Carney had been murdered, Appellant began supplying the officer with the names of several men who might commit such a crime, one of whom had allegedly been blackmailing Carney. Appellant told the officer that he had not seen or heard from Carney since Thursday, October 6, 1994.

Investigator Huddleston interviewed Appellant again three days later on October 12, 1994. Appellant stated that he loved Carney and that they had planned to be married. Huddleston testified that those were the only complimentary things Appellant said about his future wife and that Appellant then proceeded to speak of Carney's drunkenness and of fights and conflicts between the couple. Appellant informed the officer that Carney was a member of a necromanic society, which Appellant described as a "book of death society," and that Carney was interested in witchcraft and voodoo. Appellant further stated that Carney actually had a voodoo doll constructed to represent her ex-husband and that she had buried the doll in her backyard as a ritualistic act of her desire to see her ex-husband dead. Again, as in the first interview, Appellant offered no information about the killings, although he later admitted to being present when the deaths occurred.

Appellant left the state of Arkansas on October 13, 1994, the day after his second interview with the police. On October 21, 1994, and again on October 26, 1994, Appellant called his friend, Judy Quigley, and informed her that he had been at Graves's apartment on the night of the murders and that Graves had shot

Carney. Appellant told Quigley that he had struggled with Graves over the gun and killed Graves in self-defense, shooting him once in the stomach and once in the head.

Susan Elliott, Appellant's ex-wife, testified that she, too, had received telephone calls from Appellant during the time he had removed himself from the state, in which he informed her of his participation in the deaths of Graves and Carney. In describing the struggle that took place between himself and Graves, Appellant told Elliott that after he wrestled the gun away from Graves, "I did the fatal deed. I took the gun and I shot him in the head."

Dr. Charles Sturner, Chief Medical Examiner at the Arkansas State Crime Laboratory, testified that the gunshot wound to the left side of Aurora Carney's head was a contact or near-contact wound. Dr. Sturner further stated that the wound to Aurora Carney's head was consistent with an "execution" wound because the wound was inside the left ear, which indicated that the gun would have had to have been held either against or extremely close to a vital organ, in this case the head and neck area. Dr. Sturner described a similar gunshot wound to the left side of James Graves's head, as well as an additional gunshot wound on the right side of Graves's head. Dr. Sturner stated that either shot in and of itself would have been fatal and that a second shot was not necessary to ensure the victim's death. Regarding the gunshot wound to the left side of Graves's head, Dr. Sturner stated that the gun would have actually been placed in close proximity to the head. As for the wound on the right side of Graves's head, Dr. Sturner stated that the gun would have been a little farther away, approximately six inches or less from the head. Dr. Sturner stated further that it was possible that the superficial injuries to Graves's hands could have resulted from his being shot and falling to the ground. Finally, contrary to Appellant's version of the night's events, Dr. Sturner stated unequivocally that there was no gunshot wound to Graves's stomach.

Gary Lawrence, a criminalist with the trace evidence section of the Arkansas State Crime Laboratory, tested the gun that was used in the murders and conducted tests for the presence of gunshot residue on the hands of both victims. Lawrence stated that he

found gunshot residue on the hands of James Graves. Lawrence stated that when gunshot residue is found on a person, it means that the person has either fired a gun, or has been in close proximity to the firing of a gun, or has been in a gunshot residue environment. Lawrence testified that he found that the residues from the test-firings of the murder weapon conducted at the crime lab were higher than the residues found on Graves's hands. Lawrence stated that the test-firing was representative of someone who had fired the gun and that the residues on Graves's hands were not consistent with that.

Appellant took the stand in his own defense and testified that during the evening of Friday, October 7, 1994, he had made numerous attempts to contact Carney. He stated that when he left his bookstore in Blytheville, Arkansas, just after 12:00 a.m. on Saturday, October 8, 1994, he went to Carney's home in Kennett, Missouri, to see if she had left him a message. Appellant stated that when he noticed her car was not in the driveway, he became curious as to Carney's whereabouts, because she had told him on Friday that she was going to a Alcoholics Anonymous retreat and that she would be riding with another person. Appellant stated that he left Carney's house and drove to Graves's apartment in Rector because he thought Carney might be there. Appellant arrived sometime around 2:00 a.m., and, after having seen Carney's car parked in the alleyway, he went to the door of the apartment and shook the door until Graves answered the door. Appellant stated that when he was let into the apartment, he took a set of keys belonging to Graves out of the door lock, because he did not want to get locked inside in the event there was trouble.

Appellant testified that he did not bring a gun to the apartment but that it was Carney who initially secured the gun, which belonged to Graves, and pointed it at Appellant while threatening to shoot him. Appellant stated that he convinced Carney to give him the gun, which he set down on a nearby suitcase, and that she had decided to leave with him when Graves picked up the gun. Appellant stated that Graves began waving the gun around in the vicinity of Carney, and that the gun went off, shooting Carney in the head. Appellant stated that he then began to struggle with

Graves over the gun, and that ultimately, he had shot Graves once in the stomach and once in the head in self-defense.

Appellant stated that when he realized Carney and Graves were both dead, he left the apartment. He stated further that when he got into his van, he realized he had left the gun in the apartment and he went back in and got the gun. Appellant stated that he later drove to Burdette, Arkansas, and threw the gun off a bridge into the water. Appellant stated that before he disposed of the gun, however, he emptied the shells and threw them in an area near the edge of the bridge. Appellant stated that he then drove to another bridge and disposed of Graves's keys.

On cross-examination, Appellant stated that he was forty-one years old at the time, stood over six feet tall, weighed over 240 pounds, and was nearly a black belt in judo. Appellant stated further that Graves was sixty-four years old, stood five feet ten inches tall, and weighed a little over 150 pounds. Appellant admitted that he did nothing to help either victim after they had been shot and that he later lied to the police. He admitted further that, although he was in shock, he had the forethought to go back and retrieve the gun from the apartment and dispose of it along with Graves's keys. Appellant admitted that the day after his second interview with the police, he left the state and did not return for almost three months. Appellant admitted that after he fired the shot that he said entered the stomach area of Graves's body, Graves's hands went down to the ground and he was no longer struggling with Appellant for the gun. Lastly, Appellant admitted that it was after Graves had stopped struggling that he shot Graves in the head.

## II.   Evidence of Premeditation and Deliberation

Appellant argues on appeal that there was insufficient evidence presented at trial to sustain a finding that Appellant acted with premeditation and deliberation in the deaths of Aurora Carney and James Graves. The State contends that we should affirm this point on the ground that Appellant's motion for directed verdict was not sufficiently specific in violation of A.R.Cr.P. Rule 33.1 and this court's recent case law. We agree with the State and

thus we do not reach the merits because Appellant failed to preserve this argument in the trial court.

At the close of the State's case, Appellant's attorney made the following motion:

> Your Honor, the defendant Anthony Webb would move for a directed verdict of acquittal, stating that the State has not provided a prima facie case of capital murder against Anthony Webb and makes a motion that the Court enter a finding of a directed verdict of acquittal on the charges of capital murder both as to Aurora Carney and James Graves and further wants to reallege and readopt the arguments and the contention about the admissions as previously made.

The trial court denied the motion and Appellant then presented his defense, consisting of testimony from himself and two other witnesses. At the close of all the evidence, Appellant's attorney stated:

> Your Honor, at this time the defense would renew its motion for a directed verdict of acquittal indicating that the State has not provided prima facie evidence of the defendant's guilt of capital murder of either Aurora Carney or James Graves.

Again, the trial court denied the motion.

Arkansas Rule of Criminal Procedure 33.1 provides:

> When there has been a trial by jury, the failure of a defendant to move for a directed verdict at the conclusion of the evidence presented by the prosecution and again at the close of the case because of insufficiency of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict. *A motion for a directed verdict based on insufficiency of the evidence must specify the respect in which the evidence is deficient; a motion merely stating that the evidence is insufficient for conviction does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense.* A renewal of a previous motion for a directed verdict at the close of all of the evidence preserves the issue of insufficient evidence for appeal. [Emphasis added.]

Recently, in *Lovelady v. State*, 326 Ark. 196, 931 S.W.2d 430 (1996), this court had occasion to address this issue. Lovelady contended the evidence was not sufficient to sustain the conviction. At the end of the state's case-in-chief, his attorney stated, "'[T]he defense would move that the charges against the defendant be dismissed on the basis that the State has failed to meet its burden of proof.'" *Id.* at 197, 931 S.W.2d at 431. This court held:

> We have made it clear that the proof of the element of the crime that is alleged to be missing must be specifically identified in a motion for a directed verdict. *Walker v. State*, 318 Ark. 107, 883 S.W.2d 831 (1994). "The reason underlying our holdings is that when specific grounds are stated and the absent proof is pinpointed, the trial court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof." *Id.* at 109, 883 S.W.2d 831 at 832 (quoting *Brown v. State*, 316 Ark. 724, 726, 875 S.W.2d 828, 830 (1994)). Here, Lovelady did not specify the proof alleged to be insufficient; consequently, the issue was not preserved for appellate review.

*Id.* at 197-98, 931 S.W.2d at 431-32. Here, Appellant's motion was nothing more than a general motion based on insufficient evidence and did nothing to inform the trial court of the allegedly missing proof.

In *Walker v. State*, 318 Ark. 107, 883 S.W.2d 831 (1994), relied upon by the court in *Lovelady*, this court stated that "[w]e draw a bright line and hold that a motion for a directed verdict in a criminal case must state the specific ground of the motion." *Id.* at 109, 883 S.W.2d at 832. Appellant argues that his directed-verdict motion was sufficient in this case because it was obvious to the trial court that he was challenging the State's evidence of premeditation and deliberation on both counts. Evidence of Appellant's state of mind is but one element of the offense of capital murder; causation of the death of another person must also be proved. How then, in this particular instance, was it obvious to the trial court that Appellant was only attacking the alleged deficient proof of premeditation and deliberation when Appellant had additionally maintained that he had not even caused the death of Aurora Carney? Appellant's directed-verdict motion

was thus insufficient to properly apprise the trial court of the alleged missing proof.

Appellant argues alternatively that this court is nonetheless compelled to address the merits of the point pursuant to Ark. Sup. Ct. Rule 4-3(h). That rule requires that, "[w]hen the sentence is death or life imprisonment, the Court must review all errors prejudicial to the appellant in accordance with Ark. Code Ann. Sec. 16-91-113(a)." Ark. Code Ann § 16-91-113(a) (1987) provides that, "[t]he Supreme Court need only review those matters briefed and argued by the appellant, except that, where either a sentence for life imprisonment or death has been imposed, the Supreme Court shall review all errors prejudicial to the rights of the appellant."

While it is true that Rule 4-3(h) requires us to review the record for error in life and death cases, this review presupposes that an objection was made at trial. *See Friar v. State*, 313 Ark. 253, 854 S.W.2d 318 (1993); *Withers v. State*, 308 Ark. 507, 825 S.W.2d 819 (1992). In *Jones v. State*, 323 Ark. 655, 916 S.W.2d 736 (1996), the appellant had been convicted of capital murder and sentenced to life imprisonment without parole. This court nonetheless held:

> It is well-established that a challenge to the sufficiency of the evidence requires the moving party to apprise the trial court of the specific basis on which the directed-verdict motion is made. Neither appellant's original directed-verdict motion nor his renewal motion indicates that any specific deficiency in the evidence was called to the trial court's attention. Because there was a failure to raise the specific basis for a directed verdict at trial, appellant cannot now challenge the sufficiency of the evidence on appeal.

*Id.* at 658-59, 916 S.W.2d at 738 (citations omitted). Thus, because Appellant failed to make a specific motion for directed verdict indicating the particular deficiencies in the State's proof, it is as if he failed to object at all, and that failure below precludes our review of the sufficiency of the evidence on appeal. We thus affirm as to Appellant's first point.

### III. *Appellant's Spontaneous Admission*

For his second point on appeal, Appellant argues that the trial court erred by allowing the State to introduce hearsay evidence of a spontaneous statement made by Appellant to a nurse who was drawing a sample of his blood. The conversation took place at the Piggott Clinic where Appellant had been taken by officers to have samples drawn pursuant to court order. During the suppression hearing below, the nurse, Donna Ray, stated that when she was drawing blood from Appellant's arm, Appellant commented on how painless the procedure was and that he would like for her to be the one to give his lethal injection.

Don Poole, one of the officers who had transported Appellant to the clinic, testified that he, too, was present when Appellant made the statement to the nurse, and that he remembered Appellant stating that if he got the lethal injection, would she (the nurse) be the one to administer it. Jerry Brogdon, the other officer who had accompanied Appellant to the clinic, testified that to the best of his recollection, Appellant stated, "I did not feel a thing when she stuck the needle in my arm. When it comes time to do the lethal injection, I want her to administer the needle." Brogdon stated further that he recalled Appellant stating that, "It may come to that. It may not."

Appellant testified that the statement he made was one in jest, in an attempt to relieve the nurse's apparent nervousness. Appellant recalled telling the nurse that the injection was absolutely painless and that a lethal injection would not be so bad if she was the one administering it. Appellant maintained that he made the statement as a joke and that he did not believe he was going to receive a lethal injection because he was innocent of the crimes. The trial court found the statement to be an admission under A.R.E. Rule 801(d)(2) and that it was up to the jury to decide whether the statement was made seriously, indicating some guilty knowledge of the homicides, or as a joke.

■ ■ Appellant asserts on appeal that the statement was hearsay and was not a proper admission as provided in Rule 801(d)(2) because he never manifested his belief in the truth of the statement. The State argues that the statement was relevant as evi-

dence of Appellant's consciousness of his guilt of the crimes and that the statement was an admission by a party opponent as provided in Rule 801(d)(2)(i). A trial court is accorded wide discretion in evidentiary rulings and will not be reversed on such rulings absent a manifest abuse of discretion. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996). Relevant evidence means any evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Id.*; *A.R.E. Rule 401*. A trial court's ruling on relevancy is entitled to great weight and will not be reversed absent an abuse of discretion. *Misskelley*, 323 Ark. 449, 915 S.W.2d 702; *Dixon v. State*, 311 Ark. 613, 846 S.W.2d 170 (1993).

Rule 801(d)(2) provides in part that a statement is not hearsay if:

> [t]he statement is offered against a party and is (i) *his own statement*, in either his individual or a representative capacity, (ii) a statement of which he has manifested his adoption or belief in its truth, (iii) a statement by a person authorized by him to make a statement concerning the subject, (iv) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (v) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. [Emphasis added.]

Appellant's reliance on subsection (ii) of that rule is misplaced because the statement at issue here was made by Appellant, and therefore subsection (i) clearly applies. There can be no doubt that the statement was offered by the prosecution against Appellant and that the statement was Appellant's own words. Thus, there is no need to look beyond subsection (i) to determine whether Appellant manifested his belief in the truth of the statement, because it is evident that each subsection in Rule 801(d)(2), connected by the conjunction "or," is an alternative way of demonstrating statements that are admissible as admissions by party opponents. *See Woodward v. State*, 16 Ark. App. 18, 696 S.W.2d 759 (1985). Furthermore, Appellant's claim that the statement was inadmissible because he was joking when he said it goes not to the admissibility of the evidence, but only to its weight, which lies

within the province of the jury. *Slocum v. State*, 325 Ark. 38, 924 S.W.2d 237 (1996). Because we conclude that the statement was not hearsay, as it was a statement made by Appellant, its admission at trial against Appellant was not erroneous.

■ Appellant additionally argues that the statement should have been excluded on the grounds that it was unfairly prejudicial in violation of A.R.E. Rule 403. The State argues that the statement was relevant evidence of Appellant's consciousness of his guilt in the homicides and that the probative value was not substantially outweighed by the danger of unfair prejudice. Appellant offers no authority in support of his argument, and thus, we will not address it. This court has repeatedly held that where an appellant has cited no authority for his argument, we will not consider the merits of it. *See, e.g., Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996); *Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995); *Stevens v. State*, 319 Ark. 640, 893 S.W.2d 773, *cert. denied*, 116 S. Ct. 168 (1995).

■ Lastly, Appellant argues that the admission of the statement violated his Fifth Amendment privilege against self-incrimination, because it compelled him to take the stand in his own defense in order to explain the statement. Again, Appellant provides no authority for this argument and, likewise, we will not address it. We note, however, that Appellant did file a notice of defense prior to trial stating that he would rely upon a defense of self-defense in the death of James Graves, which would virtually necessitate Appellant's testifying in his own behalf.

*IV. Mistrial*

Lastly, Appellant argues that the trial court erred in refusing to grant a mistrial when Investigator Huddleston testified that Appellant had informed him that Aurora Carney was involved in witchcraft or voodoo. Appellant asserts that the trial court entered an order in limine which prohibited any witness from testifying concerning the occult, witchcraft, or related subjects, and that the State violated that order by eliciting the testimony concerning Carney's involvement in witchcraft and voodoo. The State argued below that it was not offering the testimony to show that

Carney was in fact involved in such activity, but rather to demonstrate the way in which Appellant was defaming the victim, the woman he was supposed to have loved enough to marry, only days after she had been murdered. The State further argued that the testimony that was elicited from Investigator Huddleston was outside the scope of the order because it was a statement made by Appellant himself. The trial court stated that it had recalled meeting with the attorneys on the previous day and discussing the substance of Appellant's motion in limine in regard to Appellant's statements to the police. The trial court ruled that the testimony would be allowed as a statement by a party opponent to show how Appellant was vilifying the woman he loved shortly after her murder.

We have often held that a mistrial is a drastic remedy which should be resorted to only when there has been error so prejudicial that justice cannot be served by continuing the trial. *See, e.g., Davis v. State,* 325 Ark. 96, 925 S.W.2d 768 (1996); *Stewart v. State,* 320 Ark. 75, 894 S.W.2d 930 (1995). A trial judge's denial of a motion for mistrial will not be disturbed on appeal absent an abuse of discretion. *Weaver v. State,* 324 Ark. 290, 920 S.W.2d 491 (1996). Appellant offers no authority in support of his contention that a mistrial was warranted, nor has he demonstrated any reason why the admission of such testimony was prejudicial to him. This court will not reverse in the absence of prejudice. *Misskelley,* 323 Ark. 449, 915 S.W.2d 702. Furthermore, the record is devoid of any request by Appellant for any other remedy, such as an admonition to the jury. For these reasons, we cannot conclude that the trial court abused its discretion in allowing such testimony. In accordance with Rule 4-3(h), the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no such errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.