Roderick PATRICK *v.* STATE of Arkansas

CR 87-223                                    750 S.W.2d 391

Supreme Court of Arkansas
Opinion delivered May 16, 1988
[Rehearing denied June 20, 1988.]

*David H. Williams,* for appellant.

*Steve Clark,* Att'y Gen., by: *J. Brent Standridge,* Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. ■ The legal question in this case is whether the results of a portable breath test, or what is sometimes called a roadside sobriety test, which are not admissible to prove a person is guilty of driving while intoxicated, are admissible when they would indicate a person is not guilty. In this case the answer is yes because the evidence is exculpatory, was crucial to the defense, and sufficiently reliable to warrant admission.

Roderick Patrick, a resident of Louisiana and a student at Louisiana State University, was in Arkansas working on a family farm near Arkadelphia. It was the middle of July. According to Patrick and his witnesses, he had spent the day working on some acreage planted in Christmas trees. About 5 p.m. he left his grandmother's house in Arkadelphia to return to Shreveport. He was wearing shorts, a T-shirt, and a sweat band around his head. He carried a small hatchet in a scabbard at his waist; he had a .22 rifle in his car, which was a brown Chrysler New Yorker. About 6:00 or 6:30 p.m. a report came over the Arkansas State Police

radio that the driver of a brown Chrysler New Yorker was harassing truck drivers on the highway and the driver might have a machine gun. The location and the license number of the vehicle were provided.

Two police vehicles responded. One was an Arkansas State Police vehicle driven by Trooper Jimmy Dale Danley, who had Deputy Sheriff Red Jones with him. The other car was driven by Sam Pearson, Chief of Police of Lewisville, Arkansas. The Chrysler was located on Highway 29 and stopped. Chief Pearson had followed the vehicle for a short distance and said the driver touched the center line several times. He said as soon as he stopped the vehicle, Patrick "jumped out" of the car and staggered somewhat. Danley testified that Patrick was sweating "real bad, his eyes were bloodshot, and his clothes were soiled and disarranged." He wore a headband, had the hatchet at his waist and there was a "dagger" and a .22 caliber Ruger, model 1022, semi-automatic rifle in the vehicle. Danley said he told Patrick he was under arrest for carrying certain weapons and for DWI. No bottles or cans containing intoxicating liquor were found in the vehicle. Danley and the other officers said Patrick smelled of an alcoholic beverage.

Patrick was taken to the police station in Lewisville. He was not given a breathalizer test because there is not a certified machine in the county. Trooper Danley gave him three "field" tests for sobriety. They were the balance test, the finger to nose test, and the ABC test. He said Patrick did not perform the tests as instructed. According to Danley, Patrick could not perform the balance test, said at one point he could not remember which finger was the index finger, and counted in French. In fact, Danley said Patrick "gave the finger to" the officers.

Officer Danley gave Patrick the portable breathalizer test (PBT), which had been provided by his supervisor. It is called an Alco-Analizer II. According to Officer Danley, Patrick did not properly blow into the machine. He said Patrick blew "real quick" and not steadily; he said Patrick blew to the side of the mouthpiece, and that he did not get a reading on the machine. Based on his observation and the tests he performed, Danley concluded that Patrick was intoxicated. The other officers essentially corroborated Officer Danley's statement about smelling

alcohol and Patrick's behavior.

Patrick testified that he had not been drinking alcohol at all. He explained his dress by saying he had been doing hot, dirty work at the farm; he needed a gun for killing snakes, and the hatchet for trimming the Christmas trees. He used the knife to trim cord from a weed eater. He admitted he had a run-in with some truckers on the highway and that he did make an obscene gesture to them several times. He also admitted that he counted in French to the officers. He denied that he was told he was under arrest for DWI or anything until the next morning. He said he asked for permission to make a phone call and was denied that right until the next morning. He said that after he took the portable breath test he asked the officers for the results and the officers were simply silent. He said he still assumed that they were looking for someone else and simply had the wrong person. Patrick admitted that he did not ask to see a lawyer or ask for an independent blood test.

The radio dispatcher testified that Patrick began banging on the cell after midnight, asking for the right to make a phone call; he had not asked for permission before. She said she could not let him out since she was alone at the jail and policy prevented her from making calls for prisoners.

This was the testimony at the pretrial hearing and at the jury trial.

On the state's motion, the case was transferred from municipal court to circuit court because of the seriousness of the charges. The charge of carrying weapons was dropped, and Patrick was tried on the DWI charge. The state made a pretrial motion to prevent any reference to the PBT or its results. At the hearing on the motion, the appellant called Dr. Roger Hawk, an assistant professor at U.A.L.R., as an expert on breathalizers. His testimony was proffered on the reliability of the PBT, the results of a test he conducted, and his opinion on the results of the test Patrick took. The judge granted the motion and prohibited any reference to the test, its results, or any testimony by Dr. Hawk. The jury subsequently convicted Patrick.

■ The jury conviction must be reversed because Patrick was denied the right to use evidence that he was not guilty. The exclusion was, in this case, a denial of due process of law in

violation of the United States Constitution.

The state's argument is that because the results of such a test are not admissible against a defendant in Arkansas, they likewise cannot be used by a defendant to prove his innocence. This argument overlooks the decision of the United States Supreme Court in *Chambers* v. *Mississippi*, 410 U.S. 284 (1973). Chambers was charged with murder, and he was denied the right to cross-examine a man named McDonald who had admitted several times that he had committed the murder Chambers was accused of. A Mississippi rule of evidence prohibited the cross-examination of McDonald to elicit this evidence. The court held the "exclusion of this critical evidence, coupled with the state's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." "[Q]uite simply . . . the rulings of the trial court deprived Chambers of a fair trial." The court emphasized that it was establishing no new principle of constitutional law. The court found that considerable assurance existed that the statements excluded were reliable.

Before *Chambers*, in the case of *Washington* v. *Texas*, 388 U.S. 14 (1967), the court held that a Texas law prohibiting coparticipants in a crime from testifying for each other deprived the defendant Washington of his right to compulsory process under the Sixth Amendment to the Constitution. Washington was denied the right to put on the witness stand and examine a person who saw what happened and could have told that to the jury.

The response by state and federal courts to the *Washington* and *Chambers* decisions have been mixed. Some courts have limited *Chambers* to its facts. *Grochulski* v. *Henderson*, 637 F.2d 50 (2d Cir. 1980). One court said: "If the Supreme Court cases of *Washington* v. *Texas, supra* and *Chambers* v. *Mississippi, supra* mean anything, it is that a judge cannot keep important yet possibly unreliable evidence from the jury." *Pettijohn* v. *Hall*, 599 F.2d 476 (1st Cir. 1979). *See also* Churchwell, *The Constitutional Right to Present Evidence: Progeny of Chambers v. Mississippi*, 19 Crim. L. Bull. 131 (1983); Clinton, *The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials*, 9 Ind. L. Rev. 711 (1976); Note, *Compulsory*

*Process and Polygraph Evidence: Does Exclusion Violate a Criminal Defendant's Due Process Rights?*, 12 Conn. L. Rev. 324 (1980).

Relying on *Chambers*, the New Mexico Court of Appeals, in *State* v. *Dorsey*, 87 N.M. 323, 532 P.2d 912, *aff'd*, 88 N.M. 184, 539 P.2d 204 (1975), found that the results of a polygraph test, taken at the insistence of the defendant, should have been admitted as relevant evidence. The court ruled, in effect, that the test was conducted properly and the results were admissible, except that the state's attorney would not stipulate to the admission, a requirement of New Mexico law. The appeals court found the evidence was critical to the defense and that it should have been admitted. The court relied in part on *Chambers*. *See* Clinton, *supra*.

In *Rock* v. *Arkansas*, ___ U.S. ___, 107 S. Ct. 2704 (1987), the Supreme Court held that Arkansas's *per se* rule excluding all hypnotically refreshed testimony violated a defendant's right to testify on her own behalf. The court had this to say about its decision in *Chambers* v. *Mississippi, supra*:

> This Court reversed the judgment of conviction [in *Chambers*], holding that when a state rule of evidence conflicts with the right to present witnesses, the rule may 'not be applied mechanistically to defeat the ends of justice,' but must meet the fundamental standards of due process. . . . In the Court's view, *the State in Chambers did not demonstrate that the hearsay testimony in that case, which bore 'assurances of trustworthiness' including corroboration by other evidence, would be unreliable, and thus the defendant should have been able to introduce the exculpatory testimony.* [Italics supplied.]

■ When we examine the evidence excluded in this case, in the light of *Chambers*, we see immediately that the results of the PBT were critical to the defense. The officers testified they smelled alcohol, but Patrick denied he was drinking. No liquor was found in his vehicle. He was not given a breathalizer test nor offered a chance for a blood test. While he may not have requested a phone call until later that night, the fact remains he was in jail incommunicado until the next morning. So the results of the test, which were negative, and would have shown he was not drinking,

were critical to his defense and a fair trial.

■ But the results of such tests are not admissible in Arkansas. *See* Ark. Code Ann. §§ 5-65-201 to -207 (1987). In order for test results to be admissible under this statute, the test instrument must be certified by the Arkansas State Board of Health. Ark. Code Ann. § 5-65-206(c) and (d) (1987). *See Wells v. State*, 285 Ark. 9, 684 S.W.2d 248 (1985). The portable breath test is not one certified by the Department of Health and is therefore not admissible under this statute. *See Arkansas Regulations for Blood Alcohol Testing* (2nd Ref. 1984) (pp. 4-5). The trial court was right in this regard. But, according to *Chambers*, such evidence should be admitted if it is reliable. How reliable is the PBT? In *Boyd v. City of Montgomery*, 472 So. 2d 694 (Ala. Crim. App. 1985), the Alabama court held that the results of a PBT were admissible for the limited purpose of showing probable cause to make an arrest. The court emphasized that the test results are *not* admissible by the state to prove the charge of DWI. (We agree with the statement that under the existing law the test results cannot be used by the state against a defendant to prove a charge of DWI.)

Dr. Roger Hawk, an assistant professor at the University of Arkansas at Little Rock and an expert in breathalizers in criminal cases, testified at the pre-trial hearing that the portable breathalizer is commonly used by law enforcement officers; it is an electrochemical instrument that measures alcohol in the breath. He testified that the instrument is generally accepted as reliable in detecting the presence or absence of alcohol, although not the exact quantity. Based on his experience with the machine, he found it was sensitive to the presence of alcohol in the atmosphere around the machine; one did not have to blow directly into it for the machine to register. He said he merely took a drink of scotch and breathed toward the machine and it registered .14; ten minutes later, he took another sip, the PBT was held two feet from him and he blew as hard as he could, and it registered .06; three or four minutes later the mouthpiece was held two or three inches from his mouth and with Hawk merely talking, it registered .06. Hawk related a professional independent study that had been performed regarding the reliability of the Alco-Analizer II. It showed that the chances of a negative reading being wrong were 1 in 10,000.

■ We are convinced that the evidence is not so inherently unreliable that a jury cannot rationally evaluate it. *See* P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 1-7 (1986). *See also* Westen, *The Compulsory Process Clause*, 73 Mich. L. Rev. 73 (1974-75). This, together with the fact that the test results were necessary for Patrick to receive a fair trial, leads us to conclude that the trial court should have admitted the test results into evidence; it should have allowed the officers to be cross-examined about the test results; and the relevant admissible testimony of Dr. Hawk should have been admitted.

■ The question of whether Patrick followed the officers' instructions as to the correct procedure would go to the weight of the evidence, not the admissibility of it. *See* P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 1-8(B) (1986).

■ We hold that Patrick was not denied due process of law because he was not informed of his right to an independent test for intoxication. There is no such requirement unless he is given a test at the direction of a law enforcement officer. *See* Ark. Code Ann. § 5-65-204(e) (1987); *Sparrow* v. *State*, 284 Ark. 396, 683 S.W.2d 218 (1985); *Fletcher* v. *City of Newport*, 260 Ark. 476, 541 S.W.2d 681 (1976).

■ We also decline to hold that Patrick was denied due process of law or that the charge must be dismissed because he was not allowed to make a phone call. The facts are sharply disputed in this regard, and we cannot say the trial court was clearly wrong in denying a motion to dismiss the charge.

Reversed and remanded.