# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2430

_____

United States of America,

       Appellee,

    v.

Anthony George Iron Cloud, Sr.,

       Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of South Dakota.
\*
\*
\*

_____

Submitted:  December 15, 1998

Filed:  March 19, 1999

_____

Before MCMILLIAN, LAY and HALL,[1] Circuit Judges.

_____

LAY, Circuit Judge.

Anthony George Iron Cloud, Sr. was convicted by a jury of involuntary manslaughter under 18 U.S.C. §§ 1153 and 1112.  He appeals the district court's

_____

[1]The Honorable Cynthia H. Hall, United States Circuit Judge for the Ninth Circuit, sitting by designation.

decision to admit into evidence the results of a portable breath test ("PBT") claiming that its admission deprived him of a fair trial. We reverse and remand for a new trial.

## I. FACTS

At 9:30 p.m. on January 19, 1997, Anthony Iron Cloud gave a friend a ride to his home in the Evergreen housing area of Pine Ridge Reservation. According to Iron Cloud, he had consumed six beers over the course of six hours.[2] When Iron Cloud reached the housing area, he saw a pedestrian, Abel Iron Rope, walking along the right-hand side of the road. According to Iron Cloud, he pulled over to the left to avoid the pedestrian. He then turned to look at his passenger and hit Iron Rope. It is undisputed that Iron Cloud never applied his brakes and was driving 15 miles per hour in a 10 mile per hour zone before the accident occurred.

Abel Iron Rope had an extensive history of mental illness and was characterized by his family as a danger to himself and to the community. Iron Rope also had a history of jumping in front of cars. In 1993, he jumped in front of a propane truck on the highway causing the truck to career into a ditch. Furthermore, a police officer testified that at approximately 4:00 p.m. on January 19, 1997, the day of the accident, Iron Rope ran out directly in front of his patrol car and the officer was barely able to avoid hitting him.

---

[2]The exact amount of alcohol that Iron Cloud had consumed is a matter of dispute. Iron Cloud contends that he had six beers. Based upon the various tests given to Iron Cloud after the accident, including the PBT, the government contended that Iron Cloud drank eleven beers during that time period. There was also disputed evidence that Iron Cloud had been smoking marijuana. This information was obtained by a blood test taken five hours after the accident. The government's expert testified that Iron Cloud smoked marijuana within the time period of one hour before the crash to when the blood was taken. Iron Cloud contends that he had not smoked marijuana for two days before the accident.

After the accident, Iron Cloud and his friend checked on Iron Rope, who was sitting up and nodded when asked if he was fine. Iron Cloud left the scene of the accident, went home, and asked his wife to call 911.[3] The police arrived shortly thereafter. Twenty-five minutes after the accident, Tribal Officer Twiss administered a portable breath test ("PBT") which indicated a blood-alcohol level of .14 percent. Iron Cloud was arrested and approximately one hour after the accident he was given an intoxilyzer breath test which registered his blood-alcohol level as .11 percent. Five hours after the crash, a blood test was taken and registered .033 percent. Abel Iron Rope subsequently died as a result of the accident.

Iron Cloud was charged with involuntary manslaughter under 18 U.S.C. §§ 1153 and 1112 for operating his motor vehicle in a grossly negligent manner. Iron Cloud filed a motion in limine to exclude the PBT as evidence of anything more than a screening test used to determine probable cause for arrest. The district court overruled the motion without an evidentiary hearing. At trial, the government's witness was allowed to calculate a blood-alcohol level reading based on a hypothetical question which included the PBT and the other tests performed on Iron Cloud. The expert concluded that Iron Cloud's blood-alcohol level at the time of the accident was .13 or .14 percent.[4] At the conclusion of the trial, the district court gave a limiting jury instruction which provided that the PBT should not be considered in isolation, but could be considered with the other tests as proof of intoxication. The jury found Iron Cloud guilty and he was sentenced to 21 months imprisonment and three years supervised release. Iron Cloud appeals the admission of the PBT as substantive proof of his intoxication.

_____

[3]Iron Cloud claims that he left the scene because he was afraid of being attacked by bystanders and went straight home to call 911.

[4]Without using the PBT evidence, Iron Cloud's expert testified that his blood-alcohol level would have been .07 to .09 percent. The government contends that even without the PBT his blood-alcohol level would still be over .10 percent.

## II. DISCUSSION

*Admissibility of the PBT*

In *United States v. Black Cloud*, 101 F.3d 1258 (8th Cir. 1996), this court set forth a two part test to determine when scientific testimony is admissible. First, the district court must "determine whether the testimony is based on reliable scientific technique, and whether it will assist the jury." *Black Cloud*, 101 F.3d at 1261 (citation omitted). In its determination, the district court should consider the following factors when assessing the reliability of a scientific technique: "(1) whether the technique can be and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error for the technique and the existence and maintenance of standards for controlling the technique's operation; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-95 (1993)). Second, even if the district court concludes that the expert testimony is admissible, it "may exclude the testimony if the testimony has an unfairly prejudicial effect that substantially outweighs its probative value." *Id.* (citations omitted).

The district court in this case did not follow either of these steps. The court refused to hold a *Daubert* hearing to determine the reliability of the test, stating before the jury: "[the] PBT test does not require a *Daubert* hearing. The PBT test is a test which has been recognized in the scientific community and as such, *Daubert* is not appropriate." Tr. at 43. Neither did the court analyze whether the test would be unfairly prejudicial. We review a district court's decision to admit evidence for an abuse of discretion. *Black Cloud*, 101 F.3d at 1261.

By denying Iron Cloud's request for a *Daubert* hearing on the reliability of the PBT, the judge took the accuracy of the PBTs for granted and he ignored established procedure. Contrary to the court's statements concerning the reliability of the PBT, the PBT has not been established as reliable. PBTs are used in the field for screening purposes. The government's expert witness, Roger Mathison, agreed that the PBT was only a preliminary screening test. Tr. at 197-199. Furthermore, almost every state that has addressed the issue has refused to admit the results of the test for purposes other than probable cause.[5] Although the admissibility of evidence is

---

[5]*See also Boyd v. City of Montgomery*, 472 So.2d 694, 697 (Ala. Crim. App. 1985) (holding that preliminary breath tests are only admissible to establish probable cause); *Patrick v. State*, 750 S.W.2d 391, 394 (Ark. 1988) (stating that PBT's are admissible only on behalf of the defendant because they are unreliable); *Attix v. Voshell*, 579 A.2d 1125, 1129 (Del. Super. Ct. 1989) (holding that the PBT can be admitted only for probable cause and not for substantial evidence because no court has established that it is reliable); *State v. Zell*, 491 N.W.2d 196, 197 (Iowa Ct. App. 1992) (stating, "[t]he results of the preliminary screening test are inadmissible because the test is inherently unreliable and may register an inaccurate percentage of alcohol present in the breath, and may also be inaccurate as to the presence or absence of any alcohol at all"); *People v. Keskinen*, 441 N.W.2d 79, 82 (Mich. Ct. App. 1989) (holding that court erred in admitting evidence of the defendant's preliminary breath test); *Justice v. Director of Revenue*, 890 S.W.2d 728, 731 (Mo. Ct. App. 1995) (stating that PBTs are not admissible by statute); *State v. Strizich*, 952 P.2d 1365, 1371 (Mont. 1997) (holding that the PBT is intended only for determining probable cause); *State v. Klingelhoefer*, 382 N.W.2d 366, 369-70 (Neb. 1986) (holding that preliminary test is only relevant for limited purpose of establishing probable cause); *City of Fargo v. Ruether*, 490 N.W.2d 481, 482-83 (N.D. 1992) (holding that an alcohol screening test cannot be admitted if a defendant admits probable cause); *Commonwealth v. Stanley*, 629 A.2d 940, 942 (Pa. Super. Ct. 1993) (stating that PBT results are inadmissible); *Jones v. Town of Marion*, 1999 WL 7682, 2 (Va. Ct. App. 1999) (citing to state statute which provides that preliminary breath tests are only to be used in determining probable cause); *Thompson v. State Dept. of Licensing*, 960 P.2d 475, 477 (Wash. Ct. App. 1998) (holding that "the results of a portable breath test are not admissible as evidence at trial or to establish probable cause for arrest"); *State v. Beaver*, 512 N.W.2d 254, 358-59 (Wis. Ct. App. 1994) (PBT not admitted).

governed by federal standards,[6] in the face of this overwhelming case law as to the limited reliability of the PBT, we conclude, without further foundation being laid, that the PBT is not reliable as anything more than a screening test to be used for probable cause.

We are not persuaded by the government's argument that the district court was correct in admitting the results of the PBT test without a *Daubert* hearing because the technology has been in use for an extended period of time. The mere fact that a test has been used for a long time does not make it reliable. The same argument could be made for polygraph tests, which clearly are not admissible in this circuit. *See United States v. Williams*, 95 F.3d 723 (8th Cir. 1996); *Connor v. Auger*, 595 F.2d 407 (8th Cir. 1979).

Finally, we hold the error was not cured by the judge's limiting jury instruction. Jury Instruction No. 12 stated as follows:

> The Court has permitted the introduction of evidence of a portable breath test (PBT) taken of the defendant. You are instructed that a PBT test is not recognized, standing alone, as proof of intoxication. It may be considered, however, together with the tests of the blood, breath (intoxilyzer) and other evidence pointing to the question of whether the defendant was under the influence of alcohol at the time of the event for which the defendant stands charged.

As we have discussed, the PBT should not be used for anything other than probable cause determinations. This instruction simply makes matters worse by instructing the

---

*Compare State v. Huettl*, 379 N.W.2d 298, 305 (S.D. 1985) (holding that PBT results were inadmissible because of state implied consent statues); *State v. Anderson*, 359 N.W.2d 887 (S.D. 1984) (holding that because the PBT is a field sobriety test for establishing probable cause, the results are not admissible against a defendant.).

[6]*United States v. McMillan*, 820 F.2d 251, 255 (8th Cir. 1987).

jury that they can consider the PBT as substantive evidence, albeit in conjunction with other evidence.

*Harmless Error*

This court has held that "[e]videntiary rule violations 'which do not affect [a defendant's] constitutional rights are subject to Fed. R. Crim. P. 52(a) harmless error analysis.'" *United States v. DeAngelo*, 13 F.3d 1228, 1233 (8th Cir. 1994). Under this court's interpretation of Fed. R. Crim. P. 52(a), "[a]n error is harmless if the reviewing court, after reviewing the entire record, determines that no substantial rights of the defendant were affected, and that the error did not influence or had only a very slight influence on the verdict." *United States v. Wilcox*, 50 F.3d 600, 603 (8th Cir. 1995) (citation omitted). We will reverse the conviction "only if the jury may have been substantially swayed by improperly-admitted evidence. . . ." *Id.* (citations omitted).

Iron Cloud was accused of involuntary manslaughter under 18 U.S.C. § 1153 and 1112. The indictment was based upon the allegation that Iron Cloud operated his motor vehicle in a "grossly negligent manner" with actual knowledge that his conduct was a threat to the lives of others or with actual knowledge that would reasonably enable him to foresee the danger to others. The government sought to prove this allegation primarily by showing that Iron Cloud was intoxicated, and heavily relied on the PBT results to do so. We find that the jury may have been improperly influenced by this admitted evidence.

The admission of the PBT results becomes significant considering the government's primary contentions. The government used the PBT results in two ways. First, the government used the results to establish that Iron Cloud was intoxicated. Without the PBT results, Iron Cloud might have successfully disputed the level of his intoxication. The PBT was taken only 25 minutes after the accident

and registered a blood-alcohol level of .14 percent, well over the legal limit. Without that level, as the defense expert testified, based on the blood-alcohol reading of Iron Cloud taken some five hours after the accident, Iron Cloud's blood-alcohol level at the time of the accident could have been argued to be between .7 and .8 percent, which is under the legal limit. In giving this opinion, Dr. Robert Looyenga, a chemist who was employed for twenty-five years at South Dakota School of Mines & Technology, assumed the rate of elimination was somewhere between .011 and .015.[7]

The experts disagreed on the reliability of the intoxilyzer test. The defense counsel challenged the accuracy of both the PBT and the intoxilyzer tests. The intoxilyzer test is measured from the use of the breath, not the blood, so a ratio must be applied to get the results in the form of the blood-alcohol level. The defense contended that this ratio can lead to inaccuracies. The government's expert conceded on cross-examination that the blood test was the most reliable of the three tests and that the intoxilyzer test brought many variables into play.[8] Of course, the government

_____

[7]There was a disagreement between the experts as to the proper rate of elimination to be used in this case. The experts agree that the average person's rate is .015. Dr. Looyenga stated that the vast majority of people have rates of elimination between .01 and .02, and it is just as accurate to use the lower rate as it is to use the upper rate in computing a blood-alcohol level. The government's expert, Mr. Mathison, however, used the elimination rate of .019 to arrive at a blood-alcohol level of .13 at the time of the accident. This rate of elimination was determined using the results from the intoxilyzer and the blood test taken five hours after the accident. On cross-examination, Mr. Mathison admitted that if the elimination rate was determined using the PBT and the intoxilyzer, it would be .06, which is an unrealistic rate.

[8]Dr. Mathison testified:

Q. Okay. Again, because of the variance, because you are not actually taking blood and measuring it, now you've got another variance in there. You are trying to transfer information taken from a breath test into a blood content and you have to apply an arbitrary ratio, arbitrary only in the sense that it varies individual to individual?

-8-

disputed the challenges to the intoxilyzer's accuracy.[9] It was obviously for the jury to determine the credibility of the conflicting opinions of the two experts. Our primary concern, however, is whether the admission of the PBT test, which showed that Iron Cloud had a much higher alcohol content, bolstered the reliability of the intoxilyzer test and, therefore, influenced the jury in accepting the testimony of the government expert over the testimony of the defense. We cannot be sure that the PBT did not substantially sway the jury in this manner.

The admission of the PBT to prove intoxication is also important considering the circumstances surrounding the accident. It is undisputed that Abel Iron Rope had mental instabilities and had run out in front of cars on at least two previous occasions. In fact, he ran in front of a police officer's car earlier in the afternoon on the day of the accident in question and was nearly hit. Without the PBT to support the theory

---

A. Yes, that's correct.

Q. There can be, again, a range of inaccuracy up to 10 percent on that, isn't that right?

A. That's correct.

Q. In addition to that, if the machine is not calibrated properly and regularly, then the intoxilyzer test can be off because of erroneous calibration?

A. Certainly is possible with the use of the intoxilyzer the calibration is checked before and after the actual breath test is –

Tr. at 202-03.

[9]As we pointed out in *McMillan*, the variables associated with the intoxilyzer breath test go to the weight and not the admissibility of the tests. *McMillan*, 820 F.3d at 255.

that Iron Cloud was intoxicated, it is possible the jury could have found that the accident occurred because Abel Iron Rope ran in front of Iron Cloud's car.

Second, the government used the PBT results to undermine the veracity of the defendant. Iron Cloud testified that he drank only six beers that day. According to the government's expert's testimony, however, Iron Cloud would have had to consume at least eleven beers within that time period to have a blood-alcohol level of .13 or .14, the level derived by considering the PBT. Without the PBT results, Iron Cloud's blood-alcohol level could have been as low as .07 or .08 at the time of the accident. As a result, Iron Cloud's testimony would have been consistent with the evidence of the lower blood-alcohol level and his credibility would not have been so easily challenged.

We cannot say that the jury was not greatly influenced by the high blood-alcohol level registered through the PBT shortly after the accident, either as proof of the defendant's intoxication or of his lack of credibility. Therefore, admitting the PBT results was not harmless error.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded to the district court for a new trial.

HALL, Circuit Judge, concurring in part and dissenting.

I agree with the majority that the district court erred by admitting into evidence the PBT results. However, because I believe that the admission of the PBT results had only a slight influence on the jury's verdict, I believe that the district court's error was harmless. Therefore, I dissent.

-10-

"This circuit has established that conviction of involuntary manslaughter requires proof that a defendant acted grossly negligent in that he acted with a wanton or reckless disregard for human life, knowing that his conduct was a threat to the lives of others or having knowledge of such circumstances as could enable him to foresee the peril to which his act might subject others." *United States v. F.D.L.*, 836 F.2d 1113, 1118 (8th Cir. 1988). The evidence presented at trial showed that Iron Cloud was under the influence of alcohol and marijuana while speeding at night through a residential neighborhood on the wrong side of the road and that, immediately after seeing Able Iron Rope walking along the side of the road, Iron Cloud took his eyes off the road to carry on a conversation with his passenger and ran over Iron Rope.

Independent of the PBT results, the government introduced the results of an intoxilyzer test,[10] administered less than one hour after the accident, indicating that Iron Cloud's blood-alcohol content was 0.11. In addition, the government introduced the results of a gas chromatography test[11] that, when taken together with the results of the intoxilyzer test, indicated that Iron Cloud's blood alcohol content at the time of the accident was 0.13. Even Iron Cloud introduced evidence showing that his blood alcohol content at the time of the accident was between 0.07 and 0.09. The government's expert testified that Iron Cloud's ability to drive safely would have been significantly impaired at a blood alcohol concentration of 0.08. In addition to the evidence of Iron Cloud's blood alcohol concentration, the government introduced evidence showing that Iron Cloud had been smoking marijuana shortly before the accident. The government's expert testified that the marijuana would have

---

[10]The Supreme Court has determined that the intoxilyzer test is an accurate and reliable method of measuring blood-alcohol concentration. *See California v. Trombetta*, 467 U.S. 479, 489 (1984).

[11]The Supreme Court stated that the gas chromatography test is highly accurate in identifying the presence of alcohol and drugs in a subject's blood. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 610 n.3 (1989).

aggravated any impairment from which Iron Cloud was suffering due to the alcohol. Therefore, the jury could have inferred that, even at a blood alcohol content as low as 0.07, Iron Cloud's ability to drive safely was more significantly impaired as a result of the marijuana.

In addition to the empirical evidence of Iron Cloud's impaired ability to drive, the government showed that, instead of staying to help Iron Rope, Iron Cloud fled the scene of the accident and returned home. Although Iron Cloud claims to have told his wife to call 911, he testified that he did not know whether she ever made that call. When the police arrived at Iron Cloud's house, his wife met them at the door and told them Iron Cloud was asleep. However, when Iron Cloud came out of his bedroom, the police noticed that he did not look like he had been sleeping, but instead appeared nervous and intoxicated.[12]

Under these circumstances, I believe that the evidence shows overwhelmingly that Iron Cloud knew that his actions were a threat to Iron Rope's life, and that despite this knowledge Iron Cloud acted in wanton disregard of Iron Rope's life. Based on the overwhelming evidence demonstrating that Iron Cloud was grossly negligent in running over Iron Rope, I believe that the PBT result had "only a very slight influence on the verdict," and that its admission was therefore harmless error. *See United States v. Wilcox*, 50 F.3d 600, 603 (8th Cir. 1995) (citation omitted).

The majority suggests that Iron Cloud should be absolved of guilt because Iron Rope may have jumped in front of Iron Cloud's truck. I cannot agree because if Iron Cloud had not been drinking and smoking marijuana before driving, and had not been

---

[12]The majority suggests that the admission of the PBT results caused the jury to question Iron Cloud's credibility with respect to his testimony that he drank only six beers instead of the 11 or 12 to which the government's witness testified. However, I believe that Iron Cloud's evasive behavior following the accident gave the jury adequate reason to question Iron Cloud's testimony.

speeding and ignoring the road while he was driving, he could have avoided Iron Rope, even if Iron Rope did jump in front of Iron Cloud's truck.[13]  Therefore, I believe that Iron Cloud's operation of his truck in this manner was grossly negligent, despite the possibility that Iron Rope jumped in front of Iron Cloud's truck.

Based on the foregoing, I believe that the judgment against Iron Cloud should be affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[13]The two drivers who testified about their encounters with Iron Rope were both able to avoid hitting him.  In addition, I note that, because Iron Cloud was looking at his passenger instead of the road, and because his passenger was seated to his right, Iron Cloud was looking in the direction from which Iron Rope allegedly jumped.  However, Iron Cloud never even saw Iron Rope until after he had driven completely over him.  I believe that Iron Cloud's wanton inattention to the road, knowing that he was in a residential neighborhood and knowing that a pedestrian was walking on the side of the road, coupled with the darkness of night, the excessive speed at which he was driving, and the drug-induced impairment of his ability to drive constitutes gross negligence.