**Earl M. REID, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 06–CT–806.**

District of Columbia Court of Appeals.

Argued Feb. 5, 2009.
Decided Sept. 17, 2009.

---

Christopher Kemmitt, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant.

Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Acting Attorney General, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

GLICKMAN, Associate Judge.

After a bench trial, the Superior Court found appellant Earl Reid guilty of possessing an open container of alcohol in a public place, a misdemeanor. Among other things, Reid contends that the government did not introduce sufficient evidence to demonstrate beyond a reasonable doubt that his drink contained at least one-half of one percent alcohol by volume, the definition of an "alcoholic beverage" under D.C. law. We agree and so reverse.

## I.

On May 26, 2005, Officer Andrew Zabavsky of the Metropolitan Police Department was on a routine bicycle patrol when he saw a group of people "hanging out in front of" a residence on Girard Street, Northwest. Zabavsky approached one of them, a man later identified as Reggie Crawford, who was holding "a green cup with little white cherries on it." Zabavsky asked Crawford what was in the cup; Crawford replied, "Oh, it's just a little alcohol. Sorry about that." Zabavsky took out his portable Roadside Breath Test (RBT). He did not, however, ask Crawford to breathe into the RBT. Instead, he held it over Crawford's drink and pressed the button on the unit to trigger a test for the presence there of alcohol fumes. The RBT indicated a positive result.

Zabavsky then turned to Reid, who was sitting against the building with a cup similar to Crawford's on the ground between his feet. Before the officer said anything, Reid volunteered, "Mine's just Kool–Aid." Apparently unwilling to trust that statement, Zabavsky picked up the cup, "tested it utilizing the RBT and obtained a reading of .352." [1] He also noticed that Reid "ha[d] the odor of alcohol on his breath," and that his "eyes were slightly red [and] bloodshot."

Reid was charged with possessing in an open container an alcoholic beverage in a public place in violation of D.C.Code § 25–1001(a)(1) (2001). [2] At trial, Zabavsky was the only witness. Over Reid's several objections, Zabavsky, an "alcohol certified" officer trained to perform field sobriety tests, [3] was permitted to testify that the

---

1. Prior to testing Reid's drink, Zabavsky reset the RBT to .000 by clearing its diaphragm of the sample obtained from Crawford's beverage.

2. In pertinent part, the statute provides that "no person in the District shall ... possess in an open container an alcoholic beverage in or upon any of the following places: (1) A street, alley, park, sidewalk, or parking area;...." The offense is punishable by a fine of up to $500, imprisonment of up to 90 days, or both. D.C.Code § 25–1001(d) (2001).

3. To become "alcohol certified," Zabavsky explained, he had to take a specialized curriculum, which included "standardized field sobriety training."

RBT reading of .352 that he had obtained when he tested the liquid in Reid's cup indicated the presence of alcohol.

Zabavsky explained that the RBT is a device "used for a preliminary breath test ... to determine whether to make an arrest or not" for driving while intoxicated. The device, he said, is shaped like a "small ... box." It has a "little hole in the top" to insert a "little breath tube," into which a driving-while-intoxicated suspect blows. Once the suspect blows into the tube, the officer administering the test presses a button. "[T]he device actually has a little diaphragm in there and it kind of goes 'shoop' and it sucks up the air. And, based on the fuel cell that's inside the [RBT], it will determine the *blood alcohol content* from that sample," explained Zabavsky. If an intoxicated driver breathed into the RBT, Zabavsky testified, and it returned a reading of .125, that meant the driver had "a blood alcohol content of .125 [percent]." [4]

Zabavsky said he also had used the RBT "[p]robably hundreds" of times in a different way—to test for the presence of alcohol in containers. "Instead of using the breath tube," he would "just hold it up above the cup, push the button and it does the same thing, it kind of goes 'shoop' and sucks up the ambient air right above the liquid and it tells me that liquid has alcohol in it." Zabavsky acknowledged that he had not been trained to use the device in this way and could not explain the relationship between its reading and the concentration of alcohol in the tested container, except to say that, in his experience, any reading above .000 signaled the presence of "some type of alcohol," and the stronger the concentration of alcohol, the higher the

reading would be. For example, he said, "Jack Daniel's and Coke [would] have a lower reading than if it was just straight Jack Daniel's." When testing beers, Zabavsky had obtained readings in the ".15 to, maybe, .25 range." With "some alcohols," he said, "you tend to get in the 345 range," [5] while "grain alcohol ... almost flips it over; it'll put [the RBT] at a .8, .9 range."

The trial court credited Zabavsky's testimony. It noted that he had used the RBT "hundreds of times" and had "significant training on its use ... and the meaning of what registers on the device." Observing that .352 "is certainly far higher than .000," the court concluded that "the reading on the RBT device conclusively proves that [Reid's cup contained alcohol] beyond a reasonable doubt."

## II.

To be guilty of possessing an open container of alcohol in public, the substance the defendant possesses must meet the definition of an "alcoholic beverage" in D.C.Code § 25–101(5) (2001): "'Alcoholic beverage' means a liquid or solid, patented or not, containing alcohol capable of being consumed by a human being. The term 'alcoholic beverage' shall not include a liquid or solid containing less than one-half of 1% of alcohol by volume." Reid failed to raise the issue below of whether the government had proved his drink had more than 0.5% alcohol by volume, and the trial court never mentioned that threshold. The government argues that we should apply a plain-error standard of review. If Reid were arguing that the trial court's judgment should be reversed for failing to make a finding on an element of the of-

---

4. Zabavsky did not say whether this was by weight or by volume. *See infra* at 10.

5. Although this testimony was not clarified, we take it to mean that he had obtained

readings ranging from .300 to roughly .500, not that the readings were in the vicinity of .345. The uncertainty is not material to our analysis.

fense, we would. But his contention is that the evidence was insufficient to prove all of the elements of the offense beyond a reasonable doubt. Since he preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal, we will assume that the trial court found beyond a reasonable doubt that Reid's drink contained sufficient alcohol to meet the statutory definition and review the evidence pertinent to that element as we review the evidence pertinent to the others.[6]

Reid repeatedly objected to the admission of Zabavsky's key testimony, arguing that it was expert testimony he was unqualified to provide. Although there is force to Reid's objection, we find it unnecessary to resolve that issue; we will take Zabavsky's testimony at face value in deciding whether it established Reid's guilt beyond a reasonable doubt. In doing so, we view the evidence in the light most favorable to the government, and we will not reverse the trial court's findings unless they are plainly wrong or lack evidence to support them.[7] Despite that deference, we think Zabavsky's testimony could not establish beyond a reasonable doubt that Reid's drink contained the requisite concentration of alcohol.[8]

The core problem is that the raw numerical reading the RBT produced does not prove that the alcohol concentration threshold was passed, because Zabavsky did not establish an acceptable scale from which one could interpret that reading. As described above, Zabavsky testified that when the RBT is used as designed, to test the breath of an apparently intoxicated driver, it gives a (more or less accurate) reading of the driver's blood alcohol content. Thus, a reading of .125 would indicate a blood alcohol content of .125 percent. On the other hand, when Zabavsky used the RBT as he did in this case, to test alcoholic beverages, he obtained readings ranging from about .150 to .250 for beer to .800 or .900 for grain alcohol. This means that the readings cannot be taken on their face as accurate measurements of the alcohol content of the liquid under examination. We may take judicial notice that, whether measured by weight or by volume, the alcohol content of grain alcohol (or any alcoholic beverage) is orders of magnitude higher than any human being's blood alcohol level. Grain alcohol, for example, is "close to 100% pure" alcohol; one commercially available brand contains 95% alcohol by volume.[9] Yet the RBT reading,

---

6. *See Newby v. United States*, 797 A.2d 1233, 1238 (D.C.2002) ("Even though a general motion for acquittal is broadly stated, without specific grounds, it is deemed sufficient to preserve the full range of challenges to the sufficiency of the evidence." (internal quotation marks omitted)).

7. *Bacchus v. United States*, 970 A.2d 269, 277 (D.C.2009).

8. It should be noted that, by statute, the results of preliminary roadside *breath* tests performed on persons suspected of driving under the influence of alcohol are inadmissible in evidence in any judicial proceeding (except to establish the validity of the arrest or the conduct of the arresting officer). D.C.Code § 50–2201.05(b–1)(3)–(4) (2001). However,

this provision, which is not directly applicable to the test performed in this case, does not appear to have been motivated solely by concerns over the reliability of the RBT and similar instruments. The RBT should not be confused with the Intoxilyzer, a more reliable breath test that is admissible in judicial proceedings—but only, among other things, when the test has been administered "in accordance with the manufacturer's specifications." D.C.Code § 50–2205.03 (2001); *see also Poulnot v. District of Columbia*, 608 A.2d 134, 137 & n. 5 (D.C.1992).

9. Clay Campbell, Note, *Liability of Alcoholic Beverage Manufacturers: No Longer a Pink Elephant*, 31 Wm. & Mary L.Rev. 157, 179 & n. 121 (1989).

if taken literally, would mean that its alcohol content is less than one percent. Similarly, while beer is approximately 5% alcohol by volume,[10] the RBT reading, if taken literally, would indicate that its alcohol content is a small fraction of a percent. Nor do the readings obtained by Zabavsky accurately reflect the relative proportion of alcohol in the beverages he tested—while his RBT reading for grain alcohol was approximately three to six times that of beer, the actual ratio is closer to nineteen to one.

We simply do not know the explanation for the RBT's results. One possible explanation, suggested by Zabavsky's statement that grain alcohol "almost flips [the RBT reading] over," is that the RBT accurately measures the percentage proportion of alcohol in a liquid, but truncates any digits to the left of the decimal point. (E.g., if the percentage were 5.25% for beer or 95.8% for grain alcohol, the device would give read .250 for beer and .800 for alcohol.) If that is what the RBT does, it would not affect the device's accuracy in the breath tests for which it was designed,[11] but its reading then would convey little useful information about the alcohol content of a drink. In particular, if the reading is below the .5% threshold for an alcoholic beverage, as it was here, we could not know whether there was enough alcohol in the drink to violate the law or not.

An alternative explanation, more favorable to the government, is that the RBT somehow compresses the scale on which it measures the alcohol content of liquids when used as it was here (though presumably not, for some reason, when used to measure blood alcohol content), forcing all measurements to be between .000 and .999. (If so, though, the compression clearly is other than linear, and we are left to puzzle over the meaning of Zabavsky's remark that grain alcohol "almost flips [the RBT reading] over.") In other words, under this alternative explanation, the RBT in effect can operate as two different instruments depending on how it is used. First, when used in accordance with its design and the manufacturer's specifications, it can measure the amount of alcohol in a person's breath and display a number representing the actual proportion of alcohol in the person's bloodstream. Second, when used in the non-standard manner described by Zabavsky, the RBT can measure alcohol in the vapor above a container of liquid and display a number between zero and one that, though not an accurate percentage, is at least roughly proportional to the concentration of alcohol in the liquid; specifically, in Zabavsky's experience, the device can give readings of .15 to .25 for beer, .3 to .5 for stronger beverages, .8 to .9 for grain alcohol. From this it might be reasoned that, while we cannot say with any accuracy what the actual alcohol content of Reid's drink was, we can infer from the RBT's reading of .352 that it was higher than that of beer, and hence was enough to satisfy the statutory threshold.

If we could accept Zabavsky's "hundreds" of past measurements as establishing a baseline and the precision of his test of Reid's cup, we might be satisfied that the government had adduced sufficient

10. *See, e.g., Rubin v. Coors Brewing Co.,* 514 U.S. 476, 494 & n. 2, 115 S.Ct. 1585, 131 L.Ed.2d 532 (Stevens, J., concurring) (citing study determining percentage of alcohol in one brand of beer).

11. Even in cases of acute alcohol poisoning leading to death, blood-alcohol concentrations are less than 1%. *See* Glenn E. Rohrer et al., *Calculation of Blood Alcohol Concentration in Criminal Defendants,* 22 Am. J. Trial Advoc. 177, 189 (1998). A test designed for humans therefore could safely disregard the whole number to the left of the decimal, which always would be zero.

proof. But the officer's testimony ignores too many uncontrolled variables for our comfort. Among our concerns are these. First, Zabavsky did not testify that he had a standard procedure to dictate where he placed the RBT's sensor in relation to the drink. Since the RBT presumably detects and measures alcohol vapor, it might register different readings based on a variety of factors, including where and how it is held in relation to the container; whether there was a breeze; whether the drink had recently been shaken (or stirred); when and how it was prepared; the size and shape of the container; and how full the container is. Some of those factors plausibly might cause the RBT to register a relatively high reading despite the presence of less than .5% alcohol in a mixed drink. Second, the temperature of the liquid in the container would affect the rate at which it releases alcohol vapors, and the temperature of the ambient air also might affect the RBT's measurement. (Temperature may be a point of special concern, because some breath-test machines reportedly are calibrated to assume that the sample is at body temperature.[12]) Third, we do not know whether and how a positive RBT reading might be triggered by the presence of residual alcohol vapors in a cup— as might have occurred, for example, had Reid finished a strong alcoholic drink and refilled his cup with "just Kool–Aid" before going outside. Finally, because the RBT was designed to tell police whether they have probable cause to arrest a driver for driving under the influence,[13] it is possible (we cannot say for certain) that the device is calibrated to measure blood alcohol content by *weight*.[14] The open container law, however, sets its limit in alcohol by *volume*,[15] requiring a conversion that was not performed in this case.

Taking all the uncertainties into consideration, we think Zabavsky's testimony failed to eliminate the possibility of a false positive test. False positives, after all, are not unknown even when a breath test device is used correctly—concerns over reliability have led many states to exclude RBT-type evidence from criminal trials.[16] And even if the test accurately showed the presence of some alcohol in Reid's drink, one cannot say with sufficient confidence that its proportion exceeded one-half of one percent by volume. On the skimpy record before us, we conclude that a reasonable trier of fact could not find beyond

---

**12.** *See State v. Chun*, 194 N.J. 54, 943 A.2d 114, 145 (2008) (noting finding of special master that "most breath analyzers used in the United States operate on the assumption that the temperature of an expired breath sample is 34 degrees Celsius" (brackets omitted)). We concede that the temperature *might* have worked in Reid's favor (i.e., led to a lower reading), but we do not *know* whether or to what extent that is actually so.

**13.** *See* Council of the District of Columbia, Report of the Committee on the Judiciary on Bill 9–34, "The Comprehensive Anti–Drunk Driving Act of 1991," at 4 (May 22, 1991).

**14.** *See, e.g.,* D.C.Code § 50–2201.05(b)(1)(A)(i)(I) (2009 supp.) ("No person shall operate or be in physical control of any vehicle in the District ... [w]hen the person's alcohol concentration at the time of testing is 0.08 grams or more either per 100

milliliters of blood or per 210 liters of breath....").

**15.** *See* D.C.Code § 25–101(5).

**16.** *See, e.g., United States v. Iron Cloud*, 171 F.3d 587, 590 n. 5 (8th Cir.1999) (collecting cases). *See also* note 8, *supra*. To be sure, not all of the concerns over the reliability of a roadside breath test are present when the device is used to test drinks; for example, the accuracy of the reading may be affected if the subject belches shortly before taking the test. *See, e.g., In re Mahurin*, 140 Idaho 656, 99 P.3d 125, 129 (2004) (paraphrasing manual for one breath test). On the other hand, we certainly cannot say that we have exhausted the possibilities for inaccuracies in the way Zabavsky used the RBT here.

a reasonable doubt that Reid's drink was more than .5% alcohol by volume.

*Reversed.*